**IN THE UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF OHIO**
**EASTERN DIVISION**

| | |
|---|---|
| ROBERTA BLOOM, JOAN RANDELL, and ARLENE POGOLOWITZ, Derivatively on behalf of FIRSTENERGY CORPORATION | Civil Action No.: 2:20-cv-04534 |
| Plaintiffs, | |
| v. | **VERIFIED STOCKHOLDER DERIVATIVE COMPLAINT** |
| MICHAEL J. ANDERSON, STEVEN J. DEMETRIOU, JULIA L. JOHNSON, CHARLES E. JONES, DONALD T. MISHEFF, THOMAS N. MITCHELL, JAMES F. O'NEIL III, CHRISTOPHER D. PAPPAS, SANDRA PIANALTO, LUIS A. REYES, LESLIE M. TURNER, STEVEN E. STRAH, ROBERT REFFNER, JAMES F. PEARSON, K. JON TAYLOR, and MICHAEL J. DOWLING | **DEMAND FOR JURY TRIAL** |
| Defendants, | |
| and | |
| FIRST ENERGY CORPORATION, | |
| Nominal Defendant. | |

Plaintiffs Roberta Bloom, Joan Randell, and Arlene Pogolowitz ("Plaintiffs"), derivatively and on behalf of FirstEnergy Corp. ("FirstEnergy" or the "Company"), by and through the undersigned attorneys, hereby bring this Verified Stockholder Derivative Complaint (the "Complaint") for the benefit of nominal defendant FirstEnergy against the Individual Defendants (defined herein) seeking to remedy their breaches of fiduciary duties occurring between February 21, 2017 and July 21, 2020 (the "Relevant Period"). Plaintiffs make these allegations upon personal knowledge as to those allegations concerning Plaintiffs and, as to all

other matters, upon information and belief based on the investigation of undersigned counsel, which includes, without limitation: (a) review and analysis of public filings made by FirstEnergy with the United States Securities and Exchange Commission ("SEC"); (b) review and analysis of press releases and other publications disseminated by FirstEnergy; (c) review of news articles, stockholder communications, and postings on FirstEnergy's website concerning the Company's public statements; (d) pleadings, papers, and any documents filed with and publicly available from a related securities fraud class action pending in this Court captioned, *Owens v. FirstEnergy Corp. et al.,* No. Case 2:20-cv-03785 (the "Securities Class Action"); (e) pleadings, papers, and any documents filed with and publicly available from a related criminal action pending in this District captioned, *USA v. Borges,* No. Case 1:20-mj-00526 (the "Criminal Action");[1] and (f) review of other publicly available information concerning FirstEnergy and the Individual Defendants.

## NATURE OF THE ACTION

1.     This is a shareholder derivative action asserting claims for breach of fiduciary duties, insider trading, unjust enrichment, and violations of Section 14(a) of the Securities Exchange Act of 1934 (the "Exchange Act") and SEC Rule 14a-9 promulgated thereunder against certain officers and members of the Company's Board of Directors (the "Board").

2.     The Company is an electric utility company with subsidiaries and affiliates involved in the distribution, transmission, and generation of electricity, as well as energy management and other energy-related services. FirstEnergy has ten electric utility operating companies, comprising one of the United States' largest investor-owned utilities, serving more than six million customers in Ohio, Pennsylvania, West Virginia, Virginia, Maryland, New

---

[1] A copy of the complaint filed in the Criminal Action is   attached as Exhibit A and incorporated by reference.

Jersey, and New York. The Company also owned and operated two nuclear power plants in the State of Ohio, the Perry Nuclear Generating Station and the Davis-Besse Nuclear Power Station.

3.     During the Relevant Period, the Individual Defendants knowingly and/or recklessly allowed the Company to brazenly engage in bribery and racketeering scandal involving Ohio House Speaker Larry Householder ("Householder") that was allegedly funded in part by FirstEnergy. The truth was revealed on July 21, 2020 when Householder, along with certain other individuals, were arrested and charged in a racketeering conspiracy after allegedly taking approximately $60 million from FirstEnergy.

4.     The bribery scheme involved a Ohio House Bill passed in 2019 that would save FirstEnergy Solutions' nuclear power plants in Ohio from closure by giving them more than $1 billion paid for through a surcharge on electric customers starting January 1, 2021 ("HB6"). The law also reduced incentives for renewable energy. In connection therewith, during the Relevant Period, the Individual Defendants caused the Company to issue statements that falsely represented that the Company was complying with state and federal laws and regulations regarding regulatory matters, exposing the Company and its investors to the extreme undisclosed risks of reputational, legal and financial harm.

5.     The 81-page federal complaint in the Criminal Action details allegations of how FirstEnergy listed as "Company A," used an "Energy Pass-Through" to funnel millions to Householder's dark money group, Generation Now. Generation Now, a 501(c)(4) organization controlled by Householder, then supported Householder-aligned House candidates, the passage of HB6 and efforts to block a referendum to overturn the bill. The wrongdoing is described by U.S. Attorney David M. DeVillers as ***"likely the largest bribery, money laundering scheme ever***

*perpetrated against the people of the state of Ohio.*"[2]

6.   The Individual Defendants knowingly and/or recklessly allowed the Company to engage in the bribery scheme and failed to address FirstEnergy's non-compliance with relevant rules and regulations. The Individual Defendants' failure to ensure that these serious issues were addressed breached their fiduciary duties to the Company and its shareholders.

7.   The Company has been substantially damaged as a result of the Individual Defendants' knowing breaches of fiduciary duty and other misconduct. Therefore, Plaintiffs bring this action against the Individual Defendants to remedy their wrongdoing.

## **JURISDICTION**

8.   This Court has jurisdiction over the claims asserted herein pursuant to Section 27 of the 1934 Act because the claims asserted herein arise under Sections 14(a) of the 1934 Act and Rule 14a-9.

9.   This Court has supplemental jurisdiction over Plaintiffs' state law claims pursuant to 28 U.S.C. § 1367(a).

10.   This derivative action is not a collusive action to confer jurisdiction on a court of the United States that it would not otherwise have.

11.   The Court has personal jurisdiction over each of the Defendants because each Defendant is an individual who has minimum contacts with this District to justify the exercise of jurisdiction over them.

12.   Venue is proper in this District pursuant to 28 U.S.C. §§ 1391 and 1401 because the Company conducts business in this District and the events and omissions giving rise to the claims asserted herein occurred in substantial part in this District, including the dissemination of false and misleading statements into this District. In addition, the related Securities Class Action

---

[2] Emphasis has been added unless otherwise noted.

and the Criminal Action are pending in this District, as is a class action litigation against the Company for the complained of scheme by Ohio ratepayers captioned, *Smith v. FirstEnergy Corp., et al.*, Case No. 2:20-cv-3755.

## PARTIES

13.     Plaintiff Roberta Bloom ("Bloom") is a current shareholder of FirstEnergy. Bloom has continuously held FirstEnergy common stock since at least January 1, 2014. Bloom is a citizen of New York. A signed verification from Plaintiff Bloom is attached as Exhibit B.

14.     Plaintiff Joan Randell ("Randell") is a current shareholder of FirstEnergy. Randall has continuously held FirstEnergy common stock since at least January 1, 2017. Randell is a citizen of New York. A signed verification from Plaintiff Randell is attached as Exhibit C.

15.     Plaintiff Arlene Pogolowitz ("Pogolowitz") is a current shareholder of FirstEnergy. Pogolowitz has continuously held FirstEnergy common stock since at least January 1, 2014. Pogolowitz is a citizen of Florida. A signed verification from Plaintiff Pogolowitz is attached as Exhibit D.

16.     Defendant Michael J. Anderson ("Anderson") is Chairman of the board of directors of The Andersons, Inc. He has been a Director of FirstEnergy since 2007 and serves on the Board's Audit and Finance Committees. As of July 1, 2020, Anderson reported owning 59,181 shares of Company common stock. Upon information and belief, Anderson is a citizen of Ohio.

17.     Defendant Steven J. Demetriou ("Demetriou") is Chairman, Chief Executive Officer and a director of Jacobs Engineering Group Inc. He has been a Director of FirstEnergy since 2017 and serves on the Finance, Operations, Safety and Nuclear Oversight Committees. As of July 1, 2020, Demetriou reported owning 9,651 shares of Company common stock. Upon

information and belief, Demetriou is a citizen of Texas.

18.     Defendant Julia L. Johnson ("Johnson") is President of NetCommunications, LLC. She has been a Director of FirstEnergy since 2011 and serves on the Corporate Governance and Corporate Responsibility (Chair) and Finance Committees. As of July 1, 2020, Johnson reported owning 10,750 shares of Company common stock. Upon information and belief, Johnson is a citizen of Florida.

19.     Defendant Charles E. Jones ("Jones") has been President, CEO, and a director of FirstEnergy since 2015. For 2019, 2018, and 2017 Jones earned $9,073,076, $9,858,109, and $8,751,603, respectively, in compensation. Defendant Jones' actively participated in the bribery scheme as detailed in the complaint in the Criminal Action. During the Relevant Period, Defendant Jones sold the following shares with insider information regarding the Company's bribery scheme, which resulted in FirstEnergy stock trading at artificially inflated prices at the time of his stock sales:

| Date | Number of Shares | Share Price | Value |
|---|---|---|---|
| February 28, 2019 | 148,203 | $40.73 | $6,040,333 |
| February 28, 2018 | 116,045 | $32.48 | $3,769,420 |

Upon information and belief, Jones is a citizen of Ohio.

20.     Defendant Donald T. Misheff ("Misheff") is retired as managing partner of the Northeast Ohio offices of Ernst & Young LLP. He has been the non-executive Chairman of the FirstEnergy Board since May 2018 and Director of FirstEnergy since 2012. He also serves on the Audit, Corporate Governance and Corporate Responsibility Committees. On July 1, 2020, Misheff reported owning 37,157 shares of common stock. Upon information and belief, Misheff is a

citizen of Ohio.

21.    Defendant Thomas N. Mitchell ("Mitchell") is Chairman of the World Association of Nuclear Operators. He has been a Director of FirstEnergy since 2016 and serves on the Corporate Governance and Corporate Responsibility, Operations, and Safety and Nuclear Oversight (Chair) Committees. As of July 1, 2020, Mitchell reported owning 18,985 shares of Company common stock. Upon information and belief, Mitchell is a citizen of Florida.

22.    Defendant James F. O'Neil, III (O'Neill") is Principal owner of Forefront Solutions, LLC. He has been a Director of FirstEnergy since 2017 and serves on the Compensation (Chair), Operations, and Safety and Nuclear Oversight Committees. As of July 1, 2020, O'Neil reported owning 14,129 shares of Company common stock. Upon information and belief, O'Neil is a citizen of Texas.

23.    Defendant Christopher D. Pappas ("Pappas") is retired as President and CEO of Trinseo S.A. He has been a Director of FirstEnergy since 2011 and serves on the Compensation and Finance (Chair) Committees. As of July 1, 2020, Pappas reported owning 49,957 shares of Company common stock. Upon information and belief, Pappas is a citizen of the Commonwealth of Pennsylvania.

24.    Defendant Sandra Pianalto ("Pianalto") is retired as President and CEO of the Federal Reserve Bank of Cleveland. She has been a Director of FirstEnergy since 2018 and serves on the Compensation and Audit Committees. As of July 1, 2020, Pianalto reported owning 5,538 shares of Company common stock. Upon information and belief, Pianalto is a citizen of Ohio.

25.    Defendant Luis A. Reyes ("Reyes") is retired as a Regional Administrator of the U.S. Nuclear Regulatory Commission and has been a Director of FirstEnergy since 2013.

Reyes serves on the Corporate Governance and Corporate Responsibility, Operations, and Safety and Nuclear Oversight Committees. As of July 1, 2020, Reyes reported owning 30,782 shares of Company common stock. Upon information and belief, Reyes is a citizen of Georgia.

26.     Defendant Leslie M. Turner ("Turner") is retired as Senior Vice President, General Counsel, and Corporate secretary of The Hershey Company. She has been a Director of FirstEnergy since 2018 and serves on the Audit and Compensation Committees. As of July 1, 2020, Turner reported owning 1,929 shares of Company common stock. Upon information and belief, Turner is a citizen of Washington, DC.

27.     Defendant Steve E. Strah ("Strah") is President of FirstEnergy. He previously served as FirstEnergy's CFO from March 2018 until he transitioned to his current position in May 2020. Prior to March 2018, Defendant Strah served as Senior Vice President of FirstEnergy's Utilities Operations. He is a member of FirstEnergy's Leadership Council. For 2019, 2018, and 2017 Strah earned compensation of $2,844,406, $2,798,523, and $2,101,960, respectively. Upon information and belief, Strah is a citizen of Ohio.

28.     Defendant Robert Reffner ("Reffner") is Senior Vice President and Chief Legal Officer, and a member of FirstEnergy's Leadership Council. Defendant Reffner is responsible for, among other things, FirstEnergy's Legal, Ethics, Risk and Internal Auditing. For 2019, Defendant Reffner earned $1,988,848 in salary. Upon information and belief, Reffner is a citizen of Ohio.

29.     Defendant James F. Pearson ("Pearson") served as CFO of FirstEnergy until March 2018, at which time he transitioned to Vice President of Finance of FirstEnergy until his retirement on April 1, 2019. For 2019, 2018, and 2017 Pearson earned compensation of $4,058,927, $3,840,576, and $ 3,465,279, respectively. During the Relevant Period, Defendant

Pearson sold the following shares with insider information regarding the bribery scheme, which resulted in FirstEnergy stock trading at artificially inflated prices at the time of his stock sales:

| Date | Number of Shares | Share Price | Value |
|---|---|---|---|
| January 8, 2019 | 40,000 | $37.87 | $1,514,844 |

Upon information and belief, Pearson is a citizen of Ohio.

30.     Defendant K. Jon Taylor ("Taylor") took over as FirstEnergy's CFO from defendant Strah. Prior to assuming this position, he was the Company's Controller and Chief Accounting Officer until March 2018 when Taylor was named president of Ohio Operations. He was promoted to Vice President, FirstEnergy Utilities in April 2019, and elected to his current position in May 2020. Upon information and belief, Taylor is a citizen of Ohio.

31.     Defendant Michael Dowling ("Dowling") is Senior Vice President, External Affairs, and member of Leadership Council. Defendant Dowling actively participated in the bribery scheme, as detailed in the complaint in the Criminal Action. Upon information and belief, Dowling is a citizen of Ohio.

32.     Defendants Anderson, Demetriou, Johnson, Jones, Misheff, Mitchell, O'Neill, Pappas, Pianalto, Reyes, Turner, Strah, Reffner, Pearson, Taylor, and Dowling are referred to collectively as the "Individual Defendants."

33.     Defendants Anderson, Demetriou, Johnson, Jones, Misheff, Mitchell, O'Neill, Pappas, Pianalto, Reyes, Turner are referred to collectively as the "Director Defendants."

## DUTIES OF THE INDIVIDUAL DEFENDANTS

34.     By reason of their positions as officers and/or directors of the Company and because of their ability to control the corporate affairs and business of the Company, the Individual Defendants owed the Company and its shareholders fiduciary obligations of good

faith, trust, loyalty, and due care, and were and are required to use their best efforts to control and manage the Company in a fair, just, honest, and equitable manner. The Individual Defendants were and are required to act in furtherance of the best interests of the Company and its shareholders so as to benefit all shareholders equally and not in furtherance of their personal interest or benefit. Each director and officer of the Company owes to the Company and its shareholders the fiduciary duty to exercise good faith and diligence in the administration of the affairs of the Company and in the use and preservation of its property and assets, and the highest obligations of fair dealing.

35.     The Individual Defendants, because of their positions of control and authority as directors and/or officers of the Company, were able to and did, directly and/or indirectly, exercise control over the wrongful acts complained of herein.

36.     In addition, as officers and/or directors of a publicly held company, the Individual Defendants have a duty to promptly disseminate accurate and truthful information with regard to the Company's operations, performance, management, projections, and forecasts so that the market price of the Company's stock will be based on truthful and accurate information. To discharge their duties, the officers and directors of FirstEnergy were required to exercise reasonable and prudent supervision over the management, policies, practices and controls of the Company. By virtue of such duties, the officers and directors of FirstEnergy were required to, among other things:

a)  ensure that the Company complied with its legal obligations and requirements, including acting only within the scope of its legal authority and disseminating truthful and accurate statements to the SEC and the investing public;

b)  conduct the affairs of the Company in a lawful, efficient, business-like manner so

as to make it possible to provide the highest quality performance of its business, to avoid wasting the Company's assets, and to maximize the value of the Company's stock;

c) properly and accurately guide investors and analysts as to the true financial condition of the Company at any given time, including making accurate statements about the Company's financial results and prospects, and ensuring that the Company maintained an adequate system of financial controls such that the Company's financial reporting would be true and accurate at all times;

d) remain informed as to how the Company conducted its operations, and, upon receipt of notice or information of imprudent or unsound conditions or practices, make reasonable inquiry in connection therewith, and take steps to correct such conditions or practices and make such disclosures as necessary to comply with federal and state securities laws; and

e) ensure that the Company was operated in a diligent, honest and prudent manner in compliance with all applicable federal, state and local laws, rules and regulations.

37. Each Individual Defendant, as an executive officer and/or director, owed to the Company and to its shareholders the fiduciary duties of loyalty, good faith and candor in the management and administration of the affairs of the Company, as well as in the use and preservation of its property and assets. The conduct of the Individual Defendants complained of herein involves a knowing and culpable violation of their obligations as directors and officers of the Company, the absence of good faith on their part, and a reckless disregard for their duties to the Company and its shareholders that the Individual Defendants were aware or should have been aware posed a risk of serious injury to the Company.

38. The Company also maintains a Code of Business Conduct (the "Code"). The Code states its purpose as the following:

Maintaining high ethical standards builds trust with our customers, shareholders, fellow personnel, and the communities we serve. At FirstEnergy, we are all responsible for upholding high standards and being aware of ethical issues that we may face on the job. Our Code of Business Conduct communicates the fundamentals of ethical behavior in the workplace and provides important guidelines to ensure we maintain our high standards. It applies equally to all FirstEnergy personnel, including the Chief Executive Officer, Chief Financial Officer and Chief Accounting Officer.

39.     Pursuant to the Code:

Fair Dealing - We have built a reputation as a trustworthy and ethical member of our community and our industry. We are committed to maintaining the highest levels of integrity and fairness within our Company. When we fail to negotiate, perform or market in good faith, we may seriously damage our reputation and lose the loyalty of our customers. You must conduct business, including dealings with the Company's customers, suppliers, competitors and other personnel, honestly and fairly and not take unfair advantage of anyone through any misrepresentation of material facts, manipulation, concealment, abuse of privileged information, fraud, bribes, kickbacks, illegal payments, cash gifts, cash equivalent gifts or other unfair business practices. Also, please be aware that special rules apply when dealing with government employees. You should direct any questions about dealing with government employees to your supervisor.

Conflicts of Interest - We should all be aware of any potential influences that impact or appear to impact our loyalty to FirstEnergy. A "conflict of interest" can occur when your personal interest interfere with – or may appear to interfere with – the interests of the Company as a whole, or when your personal interests make it difficult for you to perform your job duties objectively and effectively. Conflicts of interest also arise when personnel, or a member of his or her immediate family, receives improper personal benefits as a result of his or her position with the Company. Avoid situations in which your personal interests are in conflict, or appear to be in conflict, with the interests of the Company or your job responsibilities. This includes the use of knowledge gained through your work activities to make decisions that will lead to personal gain and that are contrary to the law or the interests of the Company. This also includes financial relationships, including equity interests and loans to, or guarantees of obligations of, the party with the FirstEnergy relationship. Furthermore, the Company will not make any loans or guarantees to executive officers or their family members.

Protection of Corporate Assets, Including Corporate Funds - We have a

responsibility to use Company assets efficiently and carefully and to protect them from loss, theft, misuse, waste and carelessness, which have a direct impact on the Company's profitability. Company assets and funds may be used only for legitimate business purposes and may never be used for illegal purposes. Do not keep undisclosed funds nor establish any undisclosed accounts while conducting your work. Do not knowingly cause corporate funds to be used for unlawful purposes or for purposes other than those described by the documentation supporting payment. If you become aware of theft, waste or misuse of Company assets or funds or have any questions about your proper use of them, you should speak immediately with your supervisor or the Chief Ethics Officer or through the Employee Concerns Line.

Corporate Records - Information derived from our records is provided to our shareholders and investors as well as government agencies. Ensure you accurately record all financial transactions in a timely manner in accordance with prescribed accounting principles. Make full, fair, accurate, timely and understandable disclosure of financial and nonfinancial information as required by law and regulation, including reports we file with the Securities and Exchange Commission (the "SEC") and other public communications. Never knowingly record false or misleading information on any Company record, report, or document, including those reports and documents submitted to any government agency, including but not limited to the SEC. Falsifying records or keeping unrecorded funds and assets is a severe offense and may result in prosecution or termination.

Political Activities - FirstEnergy participates in the political process through political action committees and lobbying activity to the extent permitted by law. Do not bring pressure on personnel, customers, suppliers or shareholders, etc. to contribute to, support, or oppose any political group or candidate.

Compliance with the Law - Comply with both the letter and spirit of all applicable U.S. and foreign laws, rules and regulations, seeking any necessary clarifications from your immediate supervisor or the Legal Department. Do not knowingly take, or permit to be taken, any action on behalf of the Company that violates any law, rule or regulation. Acknowledge that you are expected to have an understanding of the applicable laws, rules and regulations that affect our work assignments.

Insider Trading - Because we are a public company, we are subject to a number of laws and regulations concerning the purchase and sale of our stock and other publicly traded securities, as well as laws and regulations concerning disclosure of Company information to anyone outside the Company. Regardless of your position with us, if you are aware of what is

known as "material non-public information" regarding our Company, business, affairs or prospects, you may not disclose that information to anyone outside our Company, and you are not permitted to buy or sell our stock or other publicly-traded securities of the Company until the material non-public information is known not only by individuals within our Company, but also by the general public.

"Material non-public information" is any information concerning us that is not available to the general public and which an investor would likely consider to be important in making a decision whether to buy, sell or hold our stock or other securities. A good rule of thumb to determine whether information about us is material non-public information is whether or not the release of that information to the public would have an effect on the price of our stock. The improper use of material non-public information is known as insider trading. Insider trading is unethical and a criminal offense and is strictly prohibited. All personnel should read and understand the Company's Insider Trading Policy, which is available on the Company's portal.

40. The Board of Directors has its own Code of Ethics and Business Conduct (the "Director Code") which states:

I. CONFLICT OF INTEREST

Directors must avoid any conflicts of interest between the director and the Company. Any situation that involves, or may reasonably be expected to involve, a conflict of interest with the Company, should be disclosed fully, promptly and accurately to the Corporate Governance, Sustainability and Corporate Responsibility Committee.

A "conflict of interest" can occur when a director's direct or indirect personal interest is adverse to or interferes with – or may appear to be adverse to or interfere with – the interests of the Company as a whole. Conflicts of interest also arise when a director, or a member of his or her immediate family[3] receives improper personal benefits as a result of his or her position as a director of the Company, or when a director takes actions or has interests that make it difficult for such director to perform his or her duties objectively and effectively.

The more common conflicts from which directors must refrain are as follows:

---

[3] General Commentary to NYSE Section 303A.02(b) defines "immediate family" to include a person's spouse, parents, children, siblings, mothers-in-law and fathers-in-law, sons and daughters-in-law, brothers and sisters-in-law, and anyone (other than employees) who share such person's home.

A.  Third Party Relationships

Directors shall not participate in any conduct or activities that are inconsistent with the Company's best interests or that impair or disrupt the Company's relationship with any person or entity with which the Company has or proposes to enter into a business or contractual relationship.

B.  Compensation

Non-employee directors shall not receive compensation for service as a director of the Company other than director's fees and benefits.

C. Gifts and/or Gratuities

A director and members of his or her immediate family may not accept gifts and/or gratuities from entities or persons who deal with the Company where acceptance of the gifts and/or gratuities could create the appearance of a conflict of interest or where any such gift and/or gratuity is being made in order to influence the director's actions as a member of the Board.

D. Personal Use of Company Assets

Directors shall not use Company information, assets or labor for personal use unless approved by the Chairman of the Board, Chief Executive Officer or Chief Ethics Officer as part of a compensation or expense reimbursement program available to all directors.

E. Company Loans

Directors shall not accept or request loans or guarantees of obligations from the Company.

II.      CORPORATE OPPORTUNITIES

Directors have a duty to the Company to advance its legitimate interests when the opportunity to do so arises. Directors are forbidden from: (a) taking for themselves personally opportunities related to the Company's business; (b) using the Company's information, assets, or position for personal gain; or (c) competing with the Company for business opportunities, provided, however, if the Company's disinterested directors determine that the Company will not pursue an opportunity that relates to the Company's business, a director may do so.

III.     CONFIDENTIAL INFORMATION

Directors shall maintain the confidentiality of confidential information entrusted to them by the Company and any other confidential information about the Company or its customers that comes to them, from whatever source, in their capacity as a director, except when disclosure is authorized or legally mandated. For purposes of this Code, "confidential information" includes all non-public information that might be of use to competitors, or harmful to the Company or its customers, if disclosed. In addition, Directors shall not buy or sell Company stock or other publicly-traded securities of the Company until information that constitutes "material non-public information" is known by the general public. "Material non-public information" is information which an investor would likely consider to be important in making a decision whether to buy, sell or hold the Company's stock or other securities.

IV.     PROTECTION AND PROPER USE OF COMPANY ASSETS

Directors shall protect the Company's assets from loss, theft, carelessness, misuse and waste. Directors shall also ensure that the Company's assets are being used efficiently and for legitimate business purposes.

V.      COMPLIANCE WITH LAWS, RULES AND REGULATIONS

Directors shall comply, and oversee and proactively promote compliance by employees, officers and other directors, with laws, rules and regulations applicable to the Company, including insider trading laws.

VI.     FAIR DEALING

Directors shall deal fairly with and oversee fair dealing by employees and officers with the Company's customers, suppliers, competitors and employees. Directors shall not take unfair advantage of others through manipulation, concealment, abuse of privileged information, misrepresentation of material facts or through any other unfair-dealing practice.

VII.    ENCOURAGING THE REPORTING OF ANY ILLEGAL OR UNETHICAL BEHAVIOR

Directors shall proactively promote ethical behavior and take steps to ensure the Company: (a) encourages employees to talk to supervisors, managers and other appropriate personnel when in doubt about the best course of action in a particular situation; (b) encourages employees to report violations of laws, rules, regulations or the Company's Code of Business Conduct to appropriate personnel; and (c) informs employees that the Company will not allow retaliation for reports made in good faith.

16

## VIII. COMPLIANCE PROCEDURES

Directors shall communicate any potential or suspected violations of laws, rules, regulations and this Code promptly to the Chairman of the Board, Chief Executive Officer, Chief Ethics Officer, or Chair of the Corporate Governance, Sustainability and Corporate Responsibility Committee. Violations will be investigated by the Board or by a person or persons designated by the Board and prompt, appropriate and consistent action will be taken in the event of any violations of the Code.

41. The Company also has a policy on Corporate Political Activity in which the purpose of the policy is to "govern[ ] legally permissible corporate political contributions and grassroots lobbying communications, including contributions to candidate campaigns and to entities operating under Section 527 of the Internal Revenue Code, and expenditures for non-candidate state and local ballot initiatives." The policy states:

Corporate Political Participation – Overview

Under federal law, there are limits on a corporation's ability to give direct corporate contributions to federal candidates and national political parties. Accordingly, FirstEnergy does not contribute corporate funds directly to federal political candidates or parties.

Each state has different laws, rules and regulations governing political contributions in state and local elections. Any corporate political contributions by FirstEnergy are made in accordance with applicable laws, rules and regulations.

Our contribution decisions are based on what is in the best interests of FirstEnergy and not based on the personal preferences of our executives.

Corporate Political Participation – Process and Criteria

Any request for a FirstEnergy political contribution and grassroots lobbying communications, including contributions to an entity operating under Section 527 of the Internal Revenue Code or an expenditure for a non-candidate state and local ballot initiative, shall be submitted to the External Affairs Department for review and approval. The External Affairs Department will review the request to confirm that the proposed contribution or expenditure is in the best interests of FirstEnergy and, working with the FirstEnergy Legal Department, confirm that any contribution or expenditure we consider complies with applicable election

laws, rules and regulations.

The External Affairs Department will keep accurate records of any corporate political contributions and take actions to ensure that where required, complete and accurate disclosures to government entities are made.

42. In addition, the Company's Corporate Governance and Corporate Responsibility Committee (comprised of defendants Anderson, Johnson, Misheff, Mitchell, and Reyes during the Relevant Period)[4] under its charter had the following responsibility:

The Committee shall periodically review the Company's Corporate Political Activity Policy, including practices relating to corporate political participation, and dues and/or contributions to industry groups and trade associations.

43. Lastly, the Company's Audit Committee (comprised of defendants O'Neil, Anderson, Misheff, Pianalto, and Turner during the Relevant Period)[5] is specifically tasked with the Board's oversight responsibilities. The conduct of the Audit Committee is governed by the Audit Committee Charter. Per the Audit Charter, the purpose of the Audit Committee it to, *inter alia*: is "assist the Board with oversight of: (a) The integrity of the Company's financial statements; (b) The Company's compliance with legal, risk management and regulatory requirements; (c) The independent auditor's qualifications and independence; (d) The performance of the Company's internal audit function and independent auditor; and (e) The Company's systems of internal control with respect to the accuracy of financial records, adherence to Company policies and compliance with legal and regulatory requirements."

44. The Audit Committee Charter lists the following as responsibilities of the Audit Committee:

---

[4] Defendant Johnson was appointed Chair of the Corporate Governance and Corporate Responsibility and Defendant Anderson transitioned off the Corporate Governance and Corporate Responsibility Committee in May 2019.

[5] In May 2019, Defendant O'Neil transitioned off the Audit Committee and Defendant Pianalto was appointed to the Audit Committee in his stead.

1. The Committee shall be directly responsible for the appointment, compensation and retention of (subject to shareholder ratification, if such ratification is required), and the oversight of the work and pre-approval of all auditing services provided by, any registered public accounting firm engaged (including resolution of disagreements between management and the auditor regarding financial reporting) for the purpose of preparing or issuing an audit report or performing other audit, review or attest services for the Company. The independent auditor shall audit the consolidated financial statements of the Company and the consolidated financial statements of selected subsidiaries for the fiscal year for which it is appointed and report directly to the Committee.

2. At least annually, the Committee shall obtain, review and, to the extent necessary, discuss with the independent auditor a report by the independent auditor describing:

    a)  the independent auditor's internal quality-control procedures;
    b)  or by any inquiry or investigation by governmental or professional authorities, within the preceding five years, respecting one or more independent audits carried out by the independent auditor's firm, and the steps taken to deal with those issues; and
    c)  all relationships between the independent auditor and the Company, in order to assess the auditor's independence.

3. After reviewing the foregoing report and after consideration of the independent auditor's work throughout the year, the Committee shall evaluate the independent auditor's qualifications, terms of engagement, compensation, performance and independence, which shall include the review and evaluation of the lead partner of the independent auditor. In making its evaluation, the Committee shall take into account the opinions of management and internal auditors. The Committee shall present its conclusions with respect to the independent auditor to the Board.

4. The Committee shall ensure the regular rotation of the lead audit partner and concurring partner of the independent auditor every five (5) years and consider whether it would be appropriate to implement a regular rotation of the independent auditor firm.

5. The Committee shall also review and discuss reports by the independent auditor regarding: (a) all critical accounting policies and practices used by the Company; (b) significant financial reporting issues and judgments made in connection with the preparation of financial statements, including all alternative treatments of the Company's financial information within generally accepted accounting principles ("GAAP") that have been discussed with management officials, ramifications of the use of such alternative disclosures and treatments, and the treatment preferred by the independent auditor; and (c) any other material written communication between the independent auditor's firm and the Company's management, such as any management letter or schedule of unadjusted differences. The Committee

shall have full access to the Company's books and personnel.

6. The Committee, as a whole or through the Chair, shall review and discuss with management, the internal auditor, and the independent auditor prior to filing the Company's Reports on Forms 10-K or 10-Q, any major issues regarding accounting principles and financial statement presentation, including the impact on the financial statements of significant events, transactions or changes in the Company's selection or application of accounting principles or estimates that potentially affect the quality of the financial reporting, major issues as to the adequacy of the Company's internal controls and any special audit steps adopted in light of material control deficiencies and the adequacy of disclosures about changes in internal control over financial reporting.

7. The Committee shall review and discuss with management and the independent auditor, management's report on internal control over financial reporting and the independent auditor's attestation of the Company's internal control over financial reporting prior to the filing of the Company's Form 10-K.

8. The Committee shall review disclosures made to the Committee by the Company's chief executive officer and chief financial officer during their certification process for Forms 10-K and Forms 10-Q regarding any significant deficiencies in the design or operation of internal controls or material weaknesses therein and any fraud involving management or other employees who have a significant role in the Company's internal controls.

9. In connection with its review of the Company's financial statements, the Committee shall review and discuss with management, the internal auditor and the independent auditor the matters the independent auditor is required to discuss with the Committee under auditing standards established by the Public Company Accounting Oversight Board, including Auditing Standard No. 1301, and under the rules and regulations of the SEC and other applicable authorities (as such standards and rules and regulations may be established and amended from time to time).

10. The Committee shall regularly review with the independent auditor any audit problems or difficulties encountered in the course of the audit work, any restrictions on the scope of activities or access to requested information, and any significant disagreements with management and management's response to them. The review should also include discussion of the responsibilities, budget, activities, and organizational structure (including staffing) of the internal audit function. The Committee shall review any significant findings and recommendations of the internal auditing function together with management's responses to them.

11. Based on its review and discussions with management, the internal auditor and the independent auditor, the Committee shall recommend to the Board whether

the Company's financial statements should be included in the Company's Annual Report on Form 10-K (or the annual report to shareholders if distributed prior to the filing of the Form 10-K).

12. Review and discuss with management and the independent auditor all off-balance sheet arrangements and the effect of regulatory and accounting developments on the Company's financial statements.

13. Although the Committee shall not be required to pre-approve or discuss in advance each earnings release or each instance in which the Company may provide earnings guidance, the Committee shall review and discuss with management press releases related to the Company's earnings, including the use of "pro forma" or "adjusted" non-GAAP information, as well as financial information and earnings guidance provided to financial analysts and rating agencies.

14. The Committee shall meet separately, periodically, with management, with internal auditors, with independent auditors, with the Chief Risk Officer, and with the general counsel. Further, the Committee shall, at least annually, meet with the Company's independent auditor, without the presence of any Company employees, in order to review the results of each independent audit of the Company, the report of the audit, any related management letter, management responses to recommendations made by the independent auditor in connection with the audit, all significant reports of the internal auditing department, and management's responses to those reports.

15. At least annually, the Committee shall review and approve the scope and plan of the work to be done by the Company's internal audit function, and review the results of such work. The Committee shall oversee, require and review periodic evaluations of the Company's internal control and corporate compliance structures, including the charter of the internal audit function to reasonably assure that it is consistent with that recommended by the Institute of Internal Auditors, and the resources provided to the internal audit group to reasonably assure that it has sufficient resources to carry out its charter. At least annually, the Committee shall approve the Internal Auditing Business Practice.

16. The Committee shall periodically review with the Chief Audit Officer the adequacy of the Company's internal controls and corporate compliance structures, including computerized information system controls and security, to reasonably determine, at a minimum, that: (a) components of the Company's internal control and corporate compliance structures are regularly evaluated; (b) such evaluations are performed by qualified personnel; and (c) such evaluations have reasonable scope and depth of coverage and are conducted with sufficient frequency. The Committee shall discuss with the independent auditors any significant matters regarding internal controls over financial reporting that have come to their attention during the conduct of the audit, in addition to reviewing with the

independent auditor the Company's compliance with the requirements of the Sarbanes-Oxley Act of 2002, as may be amended from time to time.

17. The Committee shall consider and review Directors', officers' and management's Company-funded expenses.

18. The Committee shall oversee, assess, discuss, and review the Company's policies with respect to the Company's major financial risk exposures and the assessment and management of risks, such as risks related to the financial statements and financial reporting process of the Company, credit risk, liquidity and commodity market risks, and risks related to cybersecurity, and discuss with management the steps taken to monitor, control and mitigate such exposures.

19. The Committee and the Board shall annually discuss and review with the Company's Chief Risk Officer the Company's risk assessment and risk management guidelines, policies and procedures.

20. Periodically, the Committee shall meet with appropriate members of management to review adherence to applicable federal, state, and local laws and corporate policies and review processes relating to training, monitoring and reporting of policy compliance. In particular, the Committee shall review the Company's Code of Business Conduct to determine that it is designed to provide adequate protection against violations of applicable laws and regulations, and shall review the record keeping and reporting systems to measure and monitor regulatory compliance requirements. In general, the Committee shall also periodically review the Company's policies and procedures regarding compliance with the Company's Code of Business Conduct and the Company's Conflicts-of-Interest Policy, and methods for disseminating information regarding the foregoing policies. The Committee shall review corrective actions taken by the Company when significant internal or corporate compliance problems are reported. If the Committee becomes aware of any significant deficiency from corporate compliance programs or internal control programs, or of material violations of established corporate policies or legal and regulatory requirements, it shall: (a) reasonably determine that all appropriate corrective actions have been taken in response thereto, and that such actions are sufficient under the circumstances; (b) review any management override (which shall include waivers permitted by policies or procedures) of corporate compliance programs and internal control programs, and take the steps necessary to reasonably determine that such action or override will not occur in the future without Board approval; and (c) review the process for reporting deficiencies or violations to reasonably assure that the Chief Audit Officer and the Chief Ethics Officer are informed of such deficiencies or violations.

21. The Committee shall establish procedures for:

a) the receipt, retention and treatment of complaints received by the Company

regarding accounting, internal accounting controls or auditing matters; and

b) the confidential, anonymous submission by the Company's employees of concerns regarding questionable accounting or auditing matters.

22. The Committee may cause on-going educational programs related to appropriate financial and accounting practices to be made available to Committee members.

23. The Committee shall communicate to the Board any issues with respect to the quality or integrity of the Company's financial statements, the Company's compliance with legal or regulatory requirements, the performance and independence of the Company's independent auditors or the performance of the internal audit function.

24. The Committee shall prepare the Audit Committee Report required by SEC rules to be included in the Company's annual proxy statement.

25. The Committee shall report regularly to the Board concerning its activities.

26. The Committee shall serve as a channel of communication between the independent auditor and the Board, and between the Chief Audit Officer and the Board.

27. The Chief Audit Officer functionally reports to the Committee and administratively to the Senior Vice President & Chief Financial Officer. The Committee will at least annually assess this reporting relationship in accordance with the Institute of Internal Auditors International Professional Practices Framework Standards and associated Practice Advisories.

28. The Committee shall discuss with management and the independent auditor any published reports or correspondence with regulators or governmental agencies that raise material issues regarding the Company's financial statements or accounting policies.

29. The Committee shall annually obtain from the independent auditor assurance that Section 10A(b) of the Exchange Act has not been implicated.

30. The Committee shall discuss with the independent auditors material issues on which the national office of the independent auditors was consulted by the Company's audit team.

44.    The Individual Defendants failed to maintain the standards laid out by both the law and the Company, resulting in the breaches of fiduciary duty and the violations of Section 14(a) and Rule 14a-9 described herein.

## SUBSTANTIVE ALLEGATIONS

### A.    COMPANY BACKGROUND AND HISTORY OF WRONGDOING

45.    FirstEnergy is a utility company based in Akron, Ohio. FirstEnergy and its subsidiaries are principally involved in the transmission, distribution, and generation of electricity. FirstEnergy's ten utility operating companies comprise one of the nation's largest investor-owner electric systems, which serves over six million customers in the Midwest and Mid-Atlantic regions. FirstEnergy's service areas encompass approximately 65,000 square miles in Ohio, Pennsylvania, West Virginia, Maryland, New Jersey, and New York, with a combined population of approximately 13.3 million.

46.    FirstEnergy also owned and operated two nuclear power plants in the State of Ohio, the Perry Nuclear Generating Station and the Davis-Besse Nuclear Power Station ("Davis-Besse") through its subsidiaries FirstEnergy Solutions Corp. ("FES") and FirstEnergy Nuclear Operating Company ("FENOC").[6]

47.    The bribery scheme that has engulfed the Company has opened old wounds for investors as in 2006 FirstEnergy was fined a record $28 million to avoid being criminally prosecuted for lying to the government about the dangerous condition of the Davis-Besse nuclear power plant's original reactor head. Davis-Besse was the site of the worst corrosion ever found at a U.S. reactor when inspectors discovered an acid leak that closed the plant for extensive repairs from 2002 to 2004. Specifically, in March 2002, it was first revealed to the public that FirstEnergy employees found cracks in parts of a critical safety mechanism in the head of Davis-

---

[6] Following a March 2018 bankruptcy and later reorganization, FES and FENOC were renamed Energy Harbor LLC (a subsidiary of Energy Harbor Corp.) and Energy Harbor Nuclear Corp., respectively. Although these subsidiaries were separated and deconsolidated from FirstEnergy's financial results, the Company continued to have numerous, material financial entanglements with FES and FENOC and an active role in financing and overseeing the corrupt conspiracy to pass HB6 as detailed herein.

Besse. It was later revealed that the Company allowed boric acid to eat a football sized hole through over six inches of the carbon steel reactor head. According to the director of the Reactor Project for the Nuclear Information and Resource Center, "FirstEnergy pushed this reactor beyond all reasonable safety margins . . . ." In July 2002, the Company admitted to NRC officials that "poor management" was a contributing factor to the major corrosion problem found at Davis-Besse.

48.    FirstEnergy not only failed to correct the dangerous conditions at Davis-Besse, but it also lied to and misled the NRC regarding Davis-Besse. For example, Davis-Besse photographs and videotapes revealed corrosion, including a photograph that became known as the "Red Photo," showing rust-colored boric acid corrosion leaking from inspection ports on the reactor's dome. Instead of revealing this information, FirstEnergy told the NRC that no known problems existed and provided the NRC with some photographs of the reactor head, but omitted the Red Photo. FirstEnergy likewise withheld a lead engineer's report describing how he was given insufficient time to inspect the reactor head despite his findings of hardened "lava-like" boric acid.

49.    Ultimately, the plant was closed when serious maintenance problems were discovered, forcing the Company to spend over $500 million on repairs, shutdown costs, and the purchase of replacement energy.

50.    At the time of the Davis-Besse debacle, it was alleged that the Board was kept apprised of the problems at Davis-Besse and that breaches of the Board's fiduciary duties also resulted in the massive blackout that interrupted electricity service to some 50 million people on August 14, 2003. It was alleged that the Board at that time ignored repeated and easily detectable warning signs that the Company's power lines were inadequately maintained and severely

25

decayed, such as frequent blackouts in Ohio, a blackout in New Jersey during the July 4, 2003 weekend, and reports that power lines in New Jersey had caused electricity to run through the ground, allowing electric charges to seep into residents' pools. Three months prior to the blackout, the agency charged with protecting the nation's electrical grid put industry officials including FirstEnergy on notice that the section of the grid covering Ohio and other parts of the Midwest were particularly vulnerable to the kind of "cascading events" that occurred. Shortly after the blackout, the *New York Times* noted that FirstEnergy had ignored regulators' warnings that its antiquated grid could falter.

51.     Consequently, on August 5, 2003, the Company announced the restatement of its financial results for 2002 and the first quarter of 2003 due to the Company having an inadequate financial reporting system in place. Multiple class action and derivative suits were filed (and eventually settled) against the Company, which forced the Company to expend millions of dollars in legal expenses. FirstEnergy was ultimately fined the $28 million discussed above for misleading regulators regarding the damage as part of a deferred-prosecution agreement.

52.     In subsequent years, as its nuclear facilities aged, maintenance costs continued to rise for the Company. At the same time, energy prices decreased for alternatives to nuclear energy, such as natural gas, and FirstEnergy's service areas experienced decreasing demand, diminishing the revenue generating potentials of the two nuclear plants.

53.     At the end of fiscal 2016, FirstEnergy's nuclear generation future looked grim. FirstEnergy reported a weak energy market, poor forecast demand and hundreds of millions of dollars in losses, owing in large part to challenges associated with its nuclear energy affiliates, FENOC and FES.

54.     Throughout the Relevant Period, the Individual Defendants reassured investors

that FirstEnergy was pursuing a legislative fix to turn around its nuclear energy fortunes. For example, in FirstEnergy's 2016 Annual Report, filed on February 21, 2017, the Company stated that it intended to pursue "legislative or regulatory solutions" to address the problem. Likewise, FirstEnergy's CEO, defendant Jones, repeated this plan on the Company's annual earnings call held with investors the next day, stating that FirstEnergy sought "legislative or regulatory initiatives for [nuclear power] generation that recognize its environmental or energy security benefits."

55.     While the attempt to turnaround the Company's nuclear power woes was received favorably by the public, the Individual Defendants concealed that the truth which was that the Company's legislative "solution" involved an illicit campaign to corrupt high-profile state legislators in order to secure a massive ratepayer-funded bailout. Over the next two-and-a-half years, FirstEnergy would headline an elaborate scheme to funnel tens of millions of dollars to state lawmakers, blanket media platforms with misleading messages, and illicitly thwart a citizens' ballot initiative.

**B.  THE BRIBERY SCHEME**

56.     On July 17, 2020, U.S. officials announced the filing of the Criminal Action against Ohio House Householder and others. The Criminal Action alleges that from March 2017 to March 2020, Householder, other individuals, and controlled Householder entities including "Generation Now" and "Energy Pass-Through," (collectively, the "Householder Enterprise" or "Enterprise") received approximately $60 million from Company A and its entities,[7] paid through Generation Now and controlled by Householder and the Householder Enterprise. In exchange for payments from Company A, Householder Enterprise helped passed HB6, legislation described as a billion-dollar "bailout" that saved from closure two failing nuclear

---

[7] "Company A" in the Criminal Action refers to FirstEnergy.

power plants in Ohio affiliated with the Company. The Enterprise then worked to corruptly ensure that HB6 went into effect by defeating a ballot initiative.

57.     In January 2017, Householder met with FirstEnergy representatives during a flight on a private FirstEnergy jet. After a 15-year hiatus from politics, Householder had won back his old seat in 2016 and was eager to re-ascend to his former Speakership position. During or around the time of this flight, a corrupt deal was struck between Householder and the Company wherein FirstEnergy agreed to funnel millions of dollars in payments to Householder for his personal enrichment and to support his bid for Speakership. In exchange, Householder promised to secure the passage of legislation that would provide a $1.3 billion bailout of FirstEnergy's failed nuclear power plants funded by Ohio ratepayers. A lobbyist for FirstEnergy's nuclear subsidiary internally referred to the arrangement as an "'unholy alliance.'"

58.     In February 2017, the corrupt conspiracy between Householder and FirstEnergy went into motion in earnest with the establishment of "Generation Now" and "Energy Pass-Through," which were Householder controlled entities used to systematically funnel dark money from Company coffers to Householder and his affiliates. The next month, Householder began receiving periodic $250,000 payments, an amount that would steadily increase until it reached into the millions of dollars a month. The conspiracy dubbed FirstEnergy the "Bank" because of the purportedly "unlimited" money it was willing to spend to corrupt the political process. In all, FirstEnergy and its affiliates paid more than $60 million to Householder and his operatives in furtherance of the bribery scheme. As lobbyist Neil Clark (characterized in the criminal complaint as Householder's political "hit man") stated in a secretly recorded conversation: "'Nobody knows the money goes to the Speaker's account . . . it's not recorded.'"

59.     Neil Clark also stated, "Generation Now is the Speaker's (c)(4)," and

FirstEnergy's "deep pockets," and the money to the Enterprise through Generation Now was "unlimited." Conspirator Matthew Borges similarly described FirstEnergy's payments to the Enterprise as "Monopoly money."

60.     Overall, these clandestine payments were used to bankroll the political campaigns of over 20 state legislative candidates. The FirstEnergy-directed enterprise managed these candidates' campaigns, paid their staffs, and designed and paid for mailers and commercials. Most of these candidates won their elections. All who won voted for Householder as Speaker, and all but two ultimately voted for FirstEnergy's legislative bailout despite its public unpopularity. In addition, Householder used a portion of the funds to personally enrich himself, including to buy a home in Florida and to settle a personal lawsuit against him.

61.     The day Householder was elected Speaker he quickly moved to uphold his end of the bargain, pledging to create a standing subcommittee on energy generation. Householder followed through shortly thereafter, securing the votes for HB6 and defending the bill against a citizens' ballot initiative. The law effectively prevented the shutdown of FirstEnergy's two money-losing Ohio nuclear plants, granting a $9 per megawatt hour subsidy to "clean" energy generation. To pay for this generous subsidy, Ohio ratepayers would be assessed a monthly fixed charge, ratcheting up energy costs for millions of consumers. The primary beneficiaries of the bill were FirstEnergy's nuclear subsidiaries, which were projected to collect approximately 94% of the payments worth an estimated $160 million annually.

62.     FirstEnergy greased the bill's passage by funneling millions of dollars through dark money political groups. These groups in turn paid for a massive media campaign in support of HB6 while concealing the Company's involvement. The $10 million media blitz was used to sway public opinion, often through highly misleading ads, and provide cover for politicians to

vote in favor of an unpopular bill. Householder also personally pressured lawmakers to support the bill, threatening those who opposed him and developing a "hyper local" "Senator-by-Senator game plan" to get the votes necessary to secure passage.

63.     At all times, Householder worked hand-in-hand with FirstEnergy and its affiliates and closely coordinated the legislative and media strategy with high-ranking Company representatives. In the short time between January 2019 and July 2019 – the period when Householder became Speaker until HB6 was signed into law – Householder called FirstEnergy CEO defendant Jones at least 30 times. Throughout the Relevant Period, Householder held at least 84 phone calls with defendant Jones, 14 phone calls with FirstEnergy's VP of External Affairs (defendant Dowling), and 188 phone calls with FirstEnergy's Director of Ohio State Affairs. This was while the bribery scheme was receiving millions of dollars from FirstEnergy and taking overt steps to put FirstEnergy's plans to corrupt the legislative process into action. Far from the work of rogue employees, the wrongdoing was directly orchestrated and overseen by Company insiders, including the Individual Defendants.

64.     The bribery scheme worked and, in July 2019, HB6 passed and was signed into law. Almost immediately, public opposition began to mobilize and citizen groups began work to get on the ballot a voter referendum to repeal the law. Under Ohio rules, the ballot campaign had until October 2019 to gather approximately 265,000 signatures to block HB6 from taking effect.

65.     FirstEnergy went into overdrive to thwart this initiative, secretly funding yet another round of highly misleading political advertisements through its dark money network. At least $38 million was wired through Generation Now into a front company that paid for an underhanded media blitz of commercials and fliers orchestrated by the illicit enterprise. These advertisements were intended to stoke fear among Ohio citizens by falsely claiming that China

was using the petition drive to invade Ohio's energy grid. An example of these advertisements is as follows:



66.     FirstEnergy went several steps further, like hiring signature collection firms to prevent them from working on the ballot initiative by creating a conflict of interest. FirstEnergy used Generation Now to pay at least 15 such firms not to work. In addition, the Company and its affiliates bribed an employee of the citizens' ballot initiative for inside information that could be used against the campaign. The transaction was implemented by Matthew Borges, a lobbyist for FirstEnergy's nuclear subsidiaries, the former Chairman of the Ohio Republican Party, and current co-criminal defendant in the Householder proceedings. Other operatives bribed signature collectors in order to subvert the ballot campaign's efforts. In the end, FirstEnergy's massive resources and unscrupulous tactics successfully prevented the referendum from gathering the requisite signatures and HB6 remained in effect.

67.     The illicit nature of these activities was well understood by FirstEnergy, the

Individual Defendants, and their co-conspirators. As one of the criminal defendants stated on a secretly recorded line, "'everybody knows [Householder is] pay to play.'" As this same criminal defendant, an industry lobbyist, later explained: "'[O]n HB 6 [FirstEnergy] got $1.3 billion in subsidies, free payments, . . . so what do they care about putting in $20 million a year for this thing, they don't give a sh*t.'"

68.     The Board at this time unequivocally knew that the Company had a cozy relationship with Householder and that FirstEnergy had engaged in multiple financial transactions involving Householder. For example, just in the first two months of 2018, FirstEnergy donated over $150,000 to candidates who backed Householder for Speaker or who are considered his allies. In 2018, it was public knowledge that Householder had also used a FirstEnergy corporate plane to attend President Donald Trump's inauguration. The Board had a heightened duty to ensure that all transactions were above board but instead the Board knowingly and/or consciously disregarded their duties to monitor such controls.

69.     For a time, FirstEnergy was able to conceal its misdeeds from the public and the market, and the Individual Defendants' unabashed attitude towards breaking the law successfully inflated the price of FirstEnergy common stock.

## C.     THE INDIVIDUAL DEFENDANTS CAUSE THE COMPANY TO ISSUE FALSE AND MISLEADING STATEMENTS DURING THE RELEVANT PERIOD

70.     The Relevant Period begins on February 21, 2017. On that date, FirstEnergy filed with the SEC its annual report on Form 10-K for the fiscal year ended December 31, 2016 (the "2016 10-K"), which was signed by Defendants Anderson, Demetriou, Johnson, Jones, Misheff, Mitchell, O'Neill, Pappas, Reyes, Pearson, and Taylor. The 2016 10-K stated that FirstEnergy would be exploring "[l]egislative or regulatory solutions for generation assets that recognize their environmental or energy security benefits." The 2016 10-K also stated with respect to FES,

FirstEnergy's nuclear subsidiary, that "management is exploring capital and other cost reductions, asset sales, and other options to improve cash flow as well as continuing with legislative efforts to explore a regulatory solution." The 2016 10-K further stated that FES "complies with the regulations, orders, policies and practices prescribed by the SEC, FERC, NRC and applicable state regulatory authorities." Defendants Jones and Pearson also filed signed certifications with the SEC stating that the 2016 10-K did not contain any false or misleading statement of fact, fairly presented FirstEnergy's results of operations, was the product of effective internal controls, and was free from fraud.

71.    On February 22, 2017, FirstEnergy held an earnings call with analysts and investors to discuss its fiscal 2016 financial results led by defendants Jones, Pearson and Taylor. During the call, defendant Jones stated:

> In Ohio, we have had meaningful dialogue with our fellow utilities and with legislators on solutions that can help ensure Ohio's future energy security. Our top priority is the preservation of our two nuclear plants in the state and legislation for a zero emission nuclear program is expected to be introduced soon. The ZEN program is intended to give state lawmakers greater control and flexibility to preserve valuable nuclear generation. We believe this legislation would preserve not only zero emission assets but jobs, economic growth, fuel diversity, price stability, and reliability and grid security for the region.
>
> We are advocating for Ohio's support for its two nuclear plants, even though the likely outcome is that [the Company] won't be the long-term owner of these assets. We are optimistic, given these discussions we have had so far and we will keep you posted as this process unfolds.

72.    On April 27, 2017, July 27, 2017 and October 26, 2017, FirstEnergy filed with the SEC its quarterly reports on Form 10-Q for the quarters ending March 31, 2017, June 30, 2017 and September 30, 2017, respectively, which were signed by defendant Taylor. These documents claimed that FirstEnergy's nuclear power business continued to comply "with the regulations, orders, policies and practices prescribed by the SEC, FERC, NRC and applicable state regulatory

authorities." They also continued to highlight the efforts of FirstEnergy's management to secure a regulatory or legislative fix for the problems posed by the Company's unprofitable nuclear facilities. For example, the quarterly reports stated that FirstEnergy's management was "continuing with legislative efforts to explore a regulatory solution" for FES or was "continuing . . . efforts to explore legislative or regulatory solutions" for FES. Defendants Jones and Pearson also filed signed certifications with the SEC stating that the quarterly reports did not contain any false or misleading statement of fact, fairly presented FirstEnergy's results of operations, were the product of effective internal controls, and were free from fraud.

73. On February 20, 2018, FirstEnergy filed with the SEC its annual report on Form 10-K for the fiscal year ended December 31, 2017 (the "2017 10-K"), which was signed by defendants Anderson, Demetriou, Johnson, Jones, Misheff, Mitchell, O'Neill, Pappas, Pianalto, Reyes, Pearson, and Taylor. The 2017 10-K stated that FirstEnergy would be exploring "legislative or regulatory solutions for generation assets that recognize their environmental or energy security benefits." The 2017 10-K further stated that FES "complies with the regulations, orders, policies and practices prescribed by the SEC, FERC, NRC and applicable state regulatory authorities." Defendants Jones and Pearson also filed signed certifications with the SEC stating that the 2017 10- K did not contain any false or misleading statement of fact, fairly presented FirstEnergy's results of operations, was the product of effective internal controls, and was free from fraud.

74. On February 21, 2018, FirstEnergy held an earnings call with analysts and investors to discuss its fiscal 2017 financial results led by defendants Jones, Pearson and Taylor. During the call, defendant Jones stated that FirstEnergy had been "very actively involved in a multitude of efforts at both the state and federal levels to support our generation assets," but he

was disappointed that those efforts had not yet resulted in "meaningful legislative or regulatory support" for the Company's nuclear facilities. He stated that FES would "continue to look at all options regarding these units," including by "continu[ing] to support policy solutions."

75. On April 23, 2018, July 31, 2018 and October 25, 2018, FirstEnergy filed with the SEC its quarterly reports on Form 10-Q for the quarters ending March 31, 2018, June 30, 2018 and September 30, 2018, respectively. These documents claimed that FirstEnergy "and its subsidiaries follow GAAP and comply with the related regulations, orders, policies and practices prescribed by the SEC, FERC, and, as applicable, the NRC, the PUCO, the PPUC, the MDPSC, the NYPSC, the WVPSC, the VSCC and the NJBPU." Defendants Jones and Strah also filed signed certifications with the SEC stating that the quarterly reports did not contain any false or misleading statement of fact, fairly presented FirstEnergy's results of operations, were the product of effective internal controls, and were free from fraud.

76. On February 19, 2019, FirstEnergy filed with the SEC its annual report on Form 10-K for the fiscal year ended December 31, 2018 (the "2018 10-K"), which was signed by Defendants Anderson, Demetriou, Johnson, Jones, Misheff, Mitchell, O'Neill, Pappas, Pianalto, Reyes, Turner, and Strah. The 2018 10-K stated that FirstEnergy "and its subsidiaries follow GAAP and comply with the related regulations, orders, policies and practices prescribed by the SEC, FERC, and, as applicable, the NRC, the PUCO, the PPUC, the MDPSC, the NYPSC, the WVPSC, the VSCC and the NJBPU." Defendants Jones and Strah also filed signed certifications with the SEC stating that the 2018 10-K did not contain any false or misleading statement of fact, fairly presented FirstEnergy's results of operations, was the product of effective internal controls, and was free from fraud.

77. On February 20, 2019, FirstEnergy held an earnings call with analysts and

investors to discuss its fiscal 2018 financial results led by defendants Jones and Strah. In response to an analyst's question about whether there was "anything at all" that FirstEnergy was working on with respect to energy utility legislation in Ohio, defendant Jones responded:

> Not in any specific form, Julien. Obviously, if our new leaders of the states – we have a new governor, a new speaker of the house, we're going to have a new Chairman of the Public Utilities Commission. *If they determine that they think the time is right to really put energy policy for the state back on the table in some fashion, legislatively, then we would expect to engage and provide our input*. But it's too early in the process for me to talk about what that might mean.

78.     On April 23, 2019, July 23, 2019 and November 4, 2019, FirstEnergy filed with the SEC its quarterly reports on Form 10-Q for the quarters ending March 31, 2019, June 30, 2019 and September 30, 2019, respectively. These documents claimed that FirstEnergy "and its subsidiaries follow GAAP and comply with the related regulations, orders, policies and practices prescribed by the SEC, FERC, and, as applicable, the NRC, the PUCO, the PPUC, the MDPSC, the NYPSC, the WVPSC, the VSCC and the NJBPU." Defendants Jones and Strah also filed signed certifications with the SEC stating that the quarterly reports did not contain any false or misleading statement of fact, fairly presented FirstEnergy's results of operations, were the product of effective internal controls, and were free from fraud.

79.     On February 10, 2020, FirstEnergy filed with the SEC its annual report on Form 10-K for the fiscal year ended December 31, 2019 (the "2019 10-K"), which was signed by defendants Jones, Strah, Anderson, Demetriou, Johnson, Jones, Misheff, Mitchell, O'Neill, Pappas, Pianalto, Reyes, and Turner. The 2019 10-K stated that FirstEnergy "and its subsidiaries follow GAAP and comply with the related regulations, orders, policies and practices prescribed by the SEC, FERC, and, as applicable, the NRC, the PUCO, the PPUC, the MDPSC, the NYPSC, the WVPSC, the VSCC and the NJBPU." Defendants Jones and Strah also filed signed

certifications with the SEC stating that the 2019 10-K did not contain any false or misleading statement of fact, fairly presented FirstEnergy's results of operations, was the product of effective internal controls, and was free from fraud.

80.     On April 23, 2020, FirstEnergy filed with the SEC its quarterly report on Form 10-Q for the quarter ending March 31, 2020. The quarterly report claimed that FirstEnergy "and its subsidiaries follow GAAP and comply with the related regulations, orders, policies and practices prescribed by the SEC, FERC, and, as applicable, the NRC, the PUCO, the PPUC, the MDPSC, the NYPSC, the WVPSC, the VSCC and the NJBPU." Defendants Jones and Strah also filed signed certifications with the SEC stating that the quarterly report did not contain any false or misleading statement of fact, fairly presented FirstEnergy's results of operations, was the product of effective internal controls, and was free from fraud.

81.     The statements referenced in ¶¶ 70 – 80 above were materially false and/or misleading when made because they failed to disclose the following adverse facts pertaining to the Company's business, operations and financial condition, which were known to or recklessly disregarded by the Individual Defendants:

a)  that FirstEnergy and its representatives and affiliates had orchestrated a $60 million campaign to corrupt the political process in order to secure the passage of legislation favoring the Company and its affiliates;

b)  that FirstEnergy and its representatives and affiliates had secretly funneled tens of millions of dollars to Ohio politicians to bribe those politicians in order to secure votes in favor of HB6, a $1.3 billion ratepayer bailout for FirstEnergy's unprofitable nuclear facilities;

c)  that FirstEnergy and its representatives and affiliates had conducted a massive, misleading advertising campaign in support of HB6 and in opposition to a ballot

initiative to repeal HB6 by passing millions of dollars through an intricate web of 'dark money' entities and front companies in order to conceal the Company's involvement;

d) that FirstEnergy and its representatives and affiliates had subverted a citizens' ballot initiative to repeal HB6 by, among other unscrupulous tactics, hiring more than 15 signature gathering firms (and thus conflicting them out of supporting the initiative) and bribing ballot initiative insiders and signature collectors;

e) that, as a result of (a)-(d) above, the statements made during the Relevant Period regarding FirstEnergy's regulatory and legislative efforts were materially false and misleading; and

f) that, as a result of (a)-(e) above, FirstEnergy was subject to an extreme, undisclosed risk of reputational, legal and financial harm.

82. In addition, Item 303 of SEC Regulation S-K, 17 C.F.R. §229.303(a)(3)(ii) ("Item 303") required the Company's quarterly and annual financial reports issued during the Relevant Period to "[d]escribe any known trends or uncertainties that have had or that the registrant reasonably expects will have a material favorable or unfavorable impact on net sales or revenues or income from continuing operations." The Individual Defendants' failure to disclose FirstEnergy's involvement in the massive bribery and corruption scheme detailed herein violated Item 303 because these activities represented known trends and uncertainties that were likely to have a material unfavorable impact on the Company's business and financial results.

**D. THE BOARD APPROVES FALSE AND MISLEADING PROXY STATEMENTS IN ORDER TO PERPETUATE THE BRIBERY SCHEME, GET RE-ELECTED, AND INCREASE THEIR COMPENSATION**

**1. The 2018 Proxy**

83. On March 30, 2018, Defendants Anderson, Demetriou, Johnson, Jones, Misheff, Mitchell, O'Neill, Pappas, Pianalto, and Reyes, reviewed, approved, and caused the Company to

file a Proxy Statement (the "2018 Proxy" or "2018 Annual Proxy").

84.     In the 2018 Annual Proxy, the Board sought shareholder approval for, *inter alia,* (1) the re-election of the Directors; and (2) to approve the Company's executive compensation on an advisory basis.

85.     With respect to Risk Management, the 2018 Proxy stated:

Board's Role in Risk Oversight

Your Company faces a variety of risks and recognizes that the effective management of those risks contributes to the overall success of your Company. Your Company has implemented a process to identify, prioritize, report, monitor, manage, and mitigate its significant risks. A Risk Policy Committee, consisting of the Chief Risk Officer and senior executive officers, provides oversight and monitoring to ensure that appropriate risk policies are established and carried out and processes are executed in accordance with selected limits and approval levels. Other management committees exist to address topical risk issues. Timely reports on significant risk issues are provided as appropriate to employees, management, senior executive officers, respective Board committees, and the full Board. The Chief Risk Officer also prepares enterprise-wide risk management reports that are presented to the Audit Committee, the Finance Committee and your Board.

86.     With respect to the role of the Directors on the Company's Audit Committee with respect to Risk Management, the 2018 Proxy stated:

Your Board administers its risk oversight function through the full Board, as well as through the various Board committees. Specifically, the full Board considers risks applicable to your Company at each meeting in connection with its consideration of significant business and financial developments of your Company. Also, the Audit Committee Charter requires the Audit Committee to oversee, assess, discuss, and generally review your Company's policies with respect to the assessment and management of risks, including risks related to the financial statements and financial reporting process of the Company, credit risk, liquidity and commodity market risks, and risks related to cybersecurity. The Audit Committee also reviews and discusses with management the steps taken to monitor, control, and mitigate such exposures. Through this oversight process, your Board obtains an understanding of significant risk issues on a timely basis, including the risks inherent in your Company's strategy. In addition, while your Company's Chief Risk Officer administratively

reports to your Chief Financial Officer (your "CFO"), he also has full access to the Audit Committee and Finance Committee and is scheduled to attend each of their committee meetings.

87.     With respect to Defendant Jones, and in support of his re-election to the Board, the 2018 Annual Proxy stated:

> **Key Attributes, Experience and Skills:** Mr. Jones received an undergraduate degree in electrical engineering from The University of Akron. He also attended the United States Naval Academy and was a member of the Institute of Electrical and Electronics Engineers. He completed the Reactor Technology Course for Utility Executives at the Massachusetts Institute of Technology and the Public Utility Executive Program at the University of Michigan. He has had an extensive, nearly forty-year career, at Ohio Edison Company and later FirstEnergy Corp., and has held various executive leadership positions, most recently Executive Vice President and President of FirstEnergy Utilities, and currently President and CEO. With this vast experience, Mr. Jones brings to your Board an extraordinary understanding of the inner workings of the public utilities industry and FirstEnergy.

88.     The 2018 Proxy also stated the following:

> Codes of Business Conduct
> Your Company's Code of Business Conduct applies to all employees, including the CEO, CFO, and Chief Accounting Officer. In addition, your Board has a separate Director Code of Ethics and Business Conduct.

89.      The above statements conveyed that the Board (i) maintained sufficient compliance, risk controls, review, and reporting programs to identify and address deficiencies in FirstEnergy's regulatory compliance; and (ii) was unaware of existing material risks that could affect the Company.

90.     The 2018 Proxy omitted any disclosures regarding the significant and massive bribery scheme the Company was engaged in. As detailed herein, the Board, at the time they approved the 2018 Proxy, had knowledge of the Company's unlawful bribery scheme, which put the Company at material risk, and yet wrongfully failed to disclose this information to shareholders.

91.     On May 15, 2018, FirstEnergy's shareholders voted to approve each of the proposals in the 2018 Proxy.

92.     The 2018 Proxy harmed FirstEnergy by interfering with its shareholders' right to cast a fully informed vote regarding critical governance issues affecting FirstEnergy. As a result of the false or misleading statements in the 2018 Proxy, FirstEnergy stockholders voted to re-elect Defendants Anderson, Demetriou, Johnson, Jones, Misheff, Mitchell, O'Neil, Pappas, Pianalto, and Reyes to the Board.

93.     The 2018 Proxy also urged stockholders to approve an advisory resolution regarding compensation paid to named executives. In support of the requested approval, in addition to the statements quoted above, the 2018 Proxy said:

> The primary objectives of your Company's executive compensation program are to attract, motivate, retain, and reward the talented executives, including the NEOs, who we believe can provide the performance and leadership to achieve success in the highly complex energy industry. Our executive compensation program is centered on a pay-for-performance philosophy.

94.     Those statements in the 2018 Annual Proxy conveyed the impression that FirstEnergy's compensation system encouraged proper performance-based compensation and advanced long-term stockholder value. In reality, FirstEnergy's compensation system actually encouraged, and consistently rewarded improper behavior. Defendants Anderson, Demetriou, Johnson, Jones, Misheff, Mitchell, O'Neil, Pappas, Pianalto, and Reyes knew that executives had breached their fiduciary duties to the Company by ignoring the bribery scheme while exposing the Company to significant and material risks and liability through their conduct.

95.     Lastly, and importantly, the 2018 Proxy stated that the Board had adequate oversight function over FirstEnergy's lobbying activities:

> Outreach and Engagement Program Shareholder Feedback

Based on the results of our Outreach and Engagement efforts, your Board has taken the following steps:

***

Enhanced Board Oversight of Lobbying Activities and Related Disclosures: Although it did not pass, in response to the vote received on the 2017 lobbying activities shareholder proposal, we elicited shareholder feedback on the Company's current practices and disclosures concerning our lobbying activities. Most of those engaged shareholders indicated little or no concern with our current disclosures; however, some investors suggested that we include more specific information about the Corporate Governance Committee's oversight role of our lobbying activities. Accordingly, in 2017, your Board further strengthened its oversight of your Company's lobbying activities and amended the Corporate Governance Committee's Charter to clarify this responsibility. The Corporate Governance Committee maintains an informed status with respect to the Company's practices relating to corporate political participation, and dues and/or contributions to industry groups and trade associations. We also regularly evaluate our related disclosures and anticipate updating these disclosures on our website.

96.     As a result of the false and misleading statements in the 2018 Proxy, FirstEnergy's stockholders voted to approve the proposals in the 2018 Proxy. Had the FirstEnergy shareholders been fully informed about the true operations at FirstEnergy, including the massive and pervasive bribery scheme, they would not have voted to re-elect the directors and would not have voted to approve the Company's executive compensation program on an advisory basis.

**2.     The 2019 Proxy**

97.     On April 1, 2019, Defendants Anderson, Demetriou, Johnson, Jones, Misheff, Mitchell, O'Neil, Pappas, Pianalto, Reyes, and Turner reviewed, approved, and caused the Company to file a Proxy Statement (the "2019 Proxy" or "2019 Annual Proxy").

98.     In the 2019 Proxy, the Board sought shareholder approval for, *inter alia,* (1) the re-election of the Directors; and (2) to approve the Company's executive compensation on an advisory basis

99.    With respect to Risk Management, the 2019 Proxy stated:

**Board Oversight**

*Risk Management*
Your Company faces a variety of risks and recognizes that the effective management of those risks contributes to the overall success of your Company. Your Company has implemented a process to identify, prioritize, report, monitor, manage, and mitigate its significant risks. A management Risk Policy Committee, consisting of the Chief Risk Officer and senior executive officers, provides oversight and monitoring to ensure that appropriate risk policies are established and carried out and processes are executed in accordance with selected limits and approval levels. Other management committees exist to address topical risk issues. Timely reports on significant risk issues are provided as appropriate to employees, management, senior executive officers, respective Board committees, and the full Board. The Chief Risk Officer also prepares enterprise-wide risk management reports that are presented to the Audit Committee, the Finance Committee and your Board.

100.    With respect to the role of the Directors on the Company's Audit Committee with respect to Risk Management, the 2019 Proxy stated:

Your Board administers its risk oversight function through the full Board, as well as through the various Board committees. Specifically, your Board considers risks applicable to your Company at each meeting in connection with its consideration of significant business and financial developments of your Company. Also, the Audit Committee Charter requires the Audit Committee to oversee, assess, discuss, and generally review your Company's policies with respect to the assessment and management of risks, including risks related to the financial statements and financial reporting process of the Company, credit risk, liquidity and commodity market risks, and risks related to cybersecurity. The Audit Committee also reviews and discusses with management the steps taken to monitor, control, and mitigate such exposures. Through this oversight process, your Board obtains an understanding of significant risk issues on a timely basis, including the risks inherent in your Company's strategy. In addition, while your Company's Chief Risk Officer administratively reports to your Chief Financial Officer (your "CFO"), he also has full access to the Audit Committee and Finance Committee and is scheduled to attend each of their committee meetings.

101. With respect to Defendant Jones, and in support of his re-election to the Board, the 2019 Annual Proxy stated:

> **Key Attributes, Experience and Skills:** Mr. Jones received an undergraduate degree in electrical engineering from The University of Akron. He also attended the United States Naval Academy and was a member of the Institute of Electrical and Electronics Engineers. He completed the Reactor Technology Course for Utility Executives at the Massachusetts Institute of Technology and the Public Utility Executive Program at the University of Michigan. He has had an extensive, nearly forty-year career, at Ohio Edison Company and later FirstEnergy Corp., and has held various executive leadership positions, most recently Executive Vice President and President of FirstEnergy Utilities, and currently President and CEO. With this vast experience, Mr. Jones brings to your Board an extraordinary understanding of the inner workings of the public utilities industry and FirstEnergy.

102. The 2019 Proxy also stated the following:

> Codes of Business Conduct
>
> Your Company's Code of Business Conduct applies to all employees, including the CEO, CFO, and Chief Accounting Officer. In addition, your Board has a separate Director Code of Ethics and Business Conduct.

103.  The above statements conveyed that the Board (i) maintained sufficient compliance, risk controls, review, and reporting programs to identify and address deficiencies in FirstEnergy's regulatory compliance; and (ii) was unaware of existing material risks that could affect the Company.

104. The 2019 Proxy omitted any disclosures regarding the significant and massive bribery scheme the Company was engaged in. As detailed herein, the Board at the time they approved the 2018 Proxy, had knowledge of the Company's unlawful bribery scheme, which put the Company at material risk, and yet wrongfully failed to disclose this information to

shareholders.

105. On May 21, 2019, FirstEnergy's shareholders voted to approve each of the proposals in the 2019 Proxy.

106. The 2019 Proxy harmed FirstEnergy by interfering with its shareholders' right to cast a fully informed vote regarding critical governance issues affecting FirstEnergy. As a result of the false or misleading statements in the 2019 Proxy, FirstEnergy stockholders voted to re-elect Defendants Anderson, Demetriou, Johnson, Jones, Misheff, Mitchell, O'Neil, Pappas, Pianalto, Reyes, and Turner to the Board.

107. The 2019 Proxy also urged stockholders to approve an advisory resolution regarding compensation paid to named executives. In support of the requested approval, in addition to the statements quoted above, the 2019 Proxy said:

> The primary objectives of your Company's executive compensation program are to attract, motivate, retain, and reward the talented executives, including the NEOs, who we believe can provide the performance and leadership to achieve success in the highly complex energy industry. Our executive compensation program is centered on a pay-for-performance philosophy.

108. Those statements in the 2019 Annual Proxy conveyed the impression that FirstEnergy's compensation system encouraged proper performance-based compensation and advanced long-term stockholder value. In reality, FirstEnergy's compensation system actually encouraged, and consistently rewarded illegal behavior. Defendants Anderson, Demetriou, Johnson, Jones, Misheff, Mitchell, O'Neil, Pappas, Pianalto, Reyes, and Turner knew that executives had breached their fiduciary duties to the Company by ignoring the bribery scheme while exposing the Company to significant and material risks and liability through their conduct.

109. As a result of the false and misleading statements in the 2019 Proxy, FirstEnergy's stockholders voted to approve the proposals in the 2019 Proxy. Had the

FirstEnergy shareholders been fully informed about the true operations at FirstEnergy, including the massive and pervasive bribery scheme, they would not have voted to re-elect the directors and would not have voted to approve the Company's executive compensation program on an advisory basis.

### 3.    The 2020 Proxy

110.    On April 1, 2020, Defendants Anderson, Demetriou, Johnson, Jones, Misheff, Mitchell, O'Neil, Pappas, Pianalto, Reyes, and Turner reviewed, approved, and caused the Company to file a Proxy Statement (the "2020 Proxy" or "2020 Annual Proxy").

111.    In the 2020 Proxy, the Board sought shareholder approval for, *inter alia,* (1) the re-election of the Directors; and (2) to approve the Company's executive compensation on an advisory basis; and (3) FirstEnergy's 2020 Incentive Compensation Plan (the "Plan").

112.    With respect to Risk Management, the 2020 Proxy stated:

> **Board Oversight**
>
> *Risk Management*
> Your Company faces a variety of risks and recognizes that the effective management of those risks contributes to the overall success of your Company. Your Company has implemented a process to identify, prioritize, report, monitor, manage, and mitigate its significant risks. A management Risk Policy Committee, consisting of the Chief Risk Officer and senior executive officers, provides oversight and monitoring to ensure that appropriate risk policies are established and carried out and processes are executed in accordance with selected limits and approval levels. Other management committees exist to address topical risk issues. Timely reports on significant risk issues are provided as appropriate to employees, management, senior executive officers, respective Board committees, and the full Board. The Chief Risk Officer also prepares enterprise-wide risk management reports that are presented to the Audit Committee, the Finance Committee and your Board.

113.    With respect to the role of the Directors on the Company's Audit Committee with respect to Risk Management, the 2020 Proxy stated:

Your Board administers its risk oversight function through the full Board, as well as through the various Board committees. Specifically, your Board considers risks applicable to your Company at each meeting in connection with its consideration of significant business and financial developments of your Company. Also, the Audit Committee Charter requires the Audit Committee to oversee, assess, discuss, and generally review your Company's policies with respect to the assessment and management of risks, including risks related to the financial statements and financial reporting process of the Company, credit risk, liquidity and commodity market risks, and risks related to cybersecurity. The Audit Committee also reviews and discusses with management the steps taken to monitor, control, and mitigate such exposures. Through this oversight process, your Board obtains an understanding of significant risk issues on a timely basis, including the risks inherent in your Company's strategy. In addition, while your Company's Chief Risk Officer administratively reports to your Chief Financial Officer (your "CFO"), he also has full access to the Audit Committee and Finance Committee and is scheduled to attend each of their committee meetings.

114. With respect to Defendant Jones, and in support of his re-election to the Board, the 2020 Annual Proxy stated:

> **Key Attributes, Experience and Skills:** Mr. Jones received an undergraduate degree in electrical engineering from The University of FirstEnergy. He also attended the United States Naval Academy and was a member of the Institute of Electrical and Electronics Engineers. He completed the Reactor Technology Course for Utility Executives at the Massachusetts Institute of Technology and the Public Utility Executive Program at the University of Michigan. He has had an extensive, nearly forty-year career, at Ohio Edison Company and later FirstEnergy Corp., and has held various executive leadership positions, most recently Executive Vice President and President of FirstEnergy Utilities, and currently President and CEO. With this vast experience, Mr. Jones brings to your Board an extraordinary understanding of the inner workings of the public utilities industry and FirstEnergy.

115. The 2020 Proxy also stated:

> Codes of Business Conduct
>
> Your Company's Code of Business Conduct applies to all employees, including the CEO, CFO, and Chief Accounting Officer. In addition, your Board has a separate Director Code of Ethics and Business Conduct.

116. The above statements conveyed that the Board (i) maintained sufficient

compliance, risk controls, review, and reporting programs to identify and address deficiencies in FirstEnergy's regulatory compliance; and (ii) was unaware of existing material risks that could affect the Company.

117. The 2020 Proxy also urged stockholders to approve an advisory resolution regarding compensation paid to named executives. In support of the requested approval, in addition to the statements quoted above, the 2020 Proxy said:

> The primary objectives of your Company's executive compensation program are to attract, motivate, retain, and reward the talented executives, including the NEOs, who we believe can provide the performance and leadership to achieve success in the highly complex energy industry. Our executive compensation program is centered on a pay-for-performance philosophy.

118. The 2020 Annual Proxy also requested shareholders to vote to approve the FirstEnergy's Plan, stating:

> The purpose of the Plan is to promote the success of your Company and its subsidiaries by providing incentives to certain employees and directors that are expected to help link their personal interests to the long-term financial success of your Company and its subsidiaries and to help increase shareholder value. By adopting the Plan, your Board believes your Company will continue to be able to attract, motivate and retain the employees and directors whose judgment, interest, efforts, and special skills will help enable your Company to succeed.

> ***

> Your Company believes its future success depends in part on its ability to attract, motivate, and retain high quality employees and directors and that the ability to provide equity-based and incentive-based awards under the Plan is critical to achieving this success. Your Company would be at a severe competitive disadvantage if it could not use share-based awards to recruit and compensate its employees and directors. The use of common stock as part of your Company's compensation program is also important because equity-based awards are an essential component of its compensation program for certain employees, as they help link compensation with long-term shareholder value creation and reward participants based on service and/or performance.

119. On May 19, 2020, FirstEnergy's shareholders voted to approve each of the proposals in the 2020 Proxy.

120. The 2020 Proxy harmed FirstEnergy by interfering with its shareholders' right to cast a fully informed vote regarding critical governance issues affecting FirstEnergy. As a result of the false or misleading statements in the 2020 Proxy, FirstEnergy stockholders voted to re-elect Defendants Anderson, Demetriou, Johnson, Jones, Misheff, Mitchell, O'Neil, Pappas, Pianalto, Reyes, and Turner to the Board.

121. Those statements in the 2020 Annual Proxy conveyed the impression that FirstEnergy's compensation system encouraged proper performance-based compensation and advanced long-term stockholder value. In reality, FirstEnergy's compensation system actually encouraged, and consistently rewarded illegal behavior. Defendants Anderson, Demetriou, Johnson, Jones, Misheff, Mitchell, O'Neil, Pappas, Pianalto, Reyes, and Turner knew that executives had breached their fiduciary duties to the Company by ignoring the bribery scheme while exposing the Company to significant and material risks and liability through their conduct.

122. As a result of the false and misleading statements in the 2020 Proxy, FirstEnergy's stockholders voted to approve the proposals in the 2020 Proxy. Had the FirstEnergy shareholders been fully informed about the true operations at FirstEnergy, including the massive and pervasive bribery scheme, they would not have voted to re-elect the directors and would not have voted to approve the Company's executive compensation program on an advisory basis, and would not have voted for the Plan.

E. THE TRUTH IS REVEALED

123. On July 21, 2020, the U.S. Attorney's Office for the Southern District of Ohio issued a press release stating in part:

**Ohio House Speaker, former chair of Ohio Republican Party, 3 other**

### individuals & 501(c)(4) entity charged in federal public corruption racketeering conspiracy involving $60 million

. . . The Ohio Speaker of the House was arrested this morning and charged in a federal racketeering conspiracy involving approximately $60 million paid to a 501(c)(4) entity to pass and uphold a billion-dollar nuclear plant bailout.

It is alleged that **Larry Householder**, 61, of Glenford, Ohio, and the enterprise conspired to violate the racketeering statute through honest services wire fraud, receipt of millions of dollars in bribes and money laundering.

Four other individuals were also arrested and charged. They include:

- **Mathew Borges**, 48, of Bexley, a lobbyist who previously served as chair of the Ohio Republican Party;

- **Jeffrey Longstreth**, 44, of Columbus, Householder's longtime campaign and political strategist;

- **Neil Clark**, 67, of Columbus, a lobbyist who owns and operates Grant Street Consultants and previously served as budget director for the Ohio Republican Caucus; and

- **Juan Cespedes**, 40, of Columbus, a multi-client lobbyist.

**Generation Now**, a corporate entity registered as a 501(c)(4) social welfare organization, was also charged.

The five individual defendants had initial appearances via video conference at 1pm today, at which time the case was unsealed.

According to the 80-page criminal complaint unsealed today, from March 2017 to March 2020, the enterprise received millions of dollars in exchange for Householder's and the enterprise's help in passing House Bill 6, a billion-dollar bailout that saved two failing, Ohio nuclear power plants from closing.

The defendants then also allegedly worked to corruptly ensure that HB 6 went into effect by defeating a ballot initiative to overturn the legislation. The Enterprise received approximately $60 million into Generation Now from an energy company and its affiliates during the relevant period.

As alleged, in February 2017, Longstreth incorporated Generation Now as a 501(c)(4) social welfare entity purporting to promote energy independence and economic development; however, the entity was secretly controlled by Householder. As Clark stated in a recorded conversation, "*Generation Now is the Speaker's (c)(4).*" Pursuant to federal law, the names and

addresses of contributors to 501(c)(4)s are not made available for public inspection.

In March 2017, Householder began receiving quarterly $250,000 payments from the related-energy companies into the bank account of Generation Now. The defendants allegedly spent millions of the company's dollars to support Householder's political bid to become Speaker, to support House candidates they believed would back Householder, and for their own personal benefit. When asked how much money was in Generation Now, Clark said, "*it's unlimited*."

The affidavit filed in support of the criminal complaint also alleges:

- In 2018, the enterprise spent energy company-to-Generation Now money on approximately 21 different state candidates – 15 (including Householder) in the primary, and six additional candidates in the general election. The Enterprise spent more than one million in fall 2018 alone to flood the airways with negative ads against enterprise opponents. Most of these candidates won the 2018 general election. All who won voted for Householder as Speaker.

- Money passed from the energy company through Generation Now was used to pay for Householder campaign staff, which would otherwise have been paid by Householder's candidate committee, Friends of Larry Householder.

- Householder received more than $400,000 in personal benefits as a result of the payments into Generation Now, including funds to settle a personal lawsuit, to pay for costs associated with his residence in Florida, and to pay off thousands of dollars of credit card debt.

- The enterprise paid $15,000 to an individual to provide insider information about the ballot initiative and offered to pay signature collectors for the ballot initiative $2,500 cash and plane fare to stop gathering signatures.

The racketeering conspiracy as charged in this case is punishable by up to 20 years in prison.

"It takes courage for citizens to assist law enforcement in the ways detailed in the affidavit," U.S. Attorney David M. DeVillers said. "We are grateful to those who felt a moral duty to work together with agents in bringing to light this alleged, significant public corruption."

"All forms of public corruption are unacceptable," stated FBI Cincinnati

Special Agent in Charge Chris Hoffman. "When the corruption is alleged to reach some of the highest levels of our state government, the citizens of Ohio should be shocked and appalled."

(Bold and italics in original.)

124.    An 81-page criminal complaint and affidavit was filed that same day in the Criminal Action. Documents filed in the Criminal Action detail a brazen scheme by FirstEnergy to corrupt the political process and undermine democratic institutions in the State of Ohio in order to secure passage of HB6. Detailed transcripts of phone calls, recorded conversations, text messages, bank records and contemporaneous documentary evidence support the allegations contained in the Criminal Action's complaint.

125.    In the Criminal Action, the Company is identified as "Company A," rather than by name, despite defendants in this case having subsequently disavowed their involvement. Prosecutors, however, have essentially confirmed that "Company A" is FirstEnergy, and that more charges may be forthcoming as the criminal investigation moves from a covert phase to an overt one, stating at a press conference: "Everyone in this room knows who Company A is . . . ." "We are not done with this case."

126.    In reaction to the news the Company stated, "[t]his afternoon, FirstEnergy received subpoenas in connection with the investigation surrounding Ohio House Bill 6. We are reviewing the details of the investigation and we intend to fully cooperate."

127.    It is just not possible that the Board had no knowledge regarding the bribery scheme alleged herein. The Individual Defendants' knowledge and/or reckless disregard for the Company's improper conduct is demonstrated by the stunning breadth and magnitude of the alleged activities, which involved the largest money-laundering and bribery scheme in Ohio history. ***Tens of millions of dollars*** were transferred from FirstEnergy bank accounts through various dark money accounts in order to secure, by corrupt means, one of the Company's top

legislative priorities. In fact, the bailouts made up about 50% of Energy Harbor's free cash flow, according to analysts at CreditSights.

128. On July 22, 2020, *Cleveland.com* published an article entitled, "FirstEnergy was relentless in quest to have Ohio legislature bail out the utility's nuclear plants," which provided the following additional details regarding the Company's illicit activities:

> FirstEnergy Corp. tried and failed more than once to convince state lawmakers to subsidize the company's two Ohio nuclear power plants, but was unable to achieve its goal until Larry Householder became speaker of the Ohio House of Representatives in 2019.
>
> As speaker, Householder wasted little time pushing through House Bill 6, legislation that included the $1 billion nuclear plant bailout at the center of racketeering charges leveled against Householder and four others on Tuesday.
>
> Householder is accused of heading up a criminal enterprise dating back to early 2017 that took in $60 million from FirstEnergy to put Householder and his supporters in power and to ram the bailout legislation through the General Assembly.
>
> House Bill 6 was imminently important to FirstEnergy. It culminated years of work by the struggling FirstEnergy-based utility to get out from under crushing debt. But with the federal charges Tuesday surrounding the lobbying effort behind the bailout, some organizations are already calling for its repeal.
>
> "Ohio House Bill 6 was an ugly corporate bailout from the beginning, and it hasn't gotten any prettier," the conservative Buckeye Institute, a Columbus-based think tank, stated on Tuesday. "The Buckeye Institute calls upon policymakers to rectify the previous error and take decisive action to move the state forward and away from subsidizing crony companies while sticking ordinary Ohioans with higher energy bills."
>
> **Early calls for help**
>
> FirstEnergy let it be known as far back as 2016 that it wanted relief for Perry nuclear plant in Lake County and Davis-Besse nuclear plant east of Toledo.
>
> During an annual energy conference in early 2017, Rep. Bill Seitz, a Cincinnati Republican, revealed that First Energy was in "substantial financial trouble." First Energy proposed something called "zero emission

credits," which would allow the utility to charge extra on electric bills because it was generating carbon-free nuclear power.

The credits would allow FirstEnergy to collect $300 million a year in perpetuity.

Bills that would have created the Zero-Emissions Nuclear Resource (ZENR) Program were introduced in the House and Senate in April 2017 and they drew plenty of testimony.

The bill "would enable Ohio to take control of a critical component of its energy future by ensuring our nuclear plants are compensated for the many benefits they provide," then First Energy CEO Charles Jones said in a statement to the House Public Utilities Committee.

## A legislative failure

Testifying before the same committee, Ned Hill, a professor in the John Glenn College of Public Affairs at Ohio State University, referred to FirstEnergy financial engineering as "fanciful."

"The Committee members have heard that energy markets are complex. And the Committee has been presented with a complex, Rube Goldberg-like financial instrument," Hill testified. "My advice to you: Protect your constituents' wallets whenever an issue is advertised as being complex, and the person offering testimony does not try to provide clarity and simplicity."

The House bill and the companion Senate bill never made it out of the committee. Changes were made and a new bill was introduced in the House in October of 2017, but it too languished in committee.

The Ohio Consumers' Counsel and the Ohio Manufacturers' Association were among those who opposed idea as did then-House Speaker Cliff Rosenberger.

## A new plan of attack

FirstEnergy wasn't about to give up. In March of 2018, First Energy announced plans to get out of the nuclear power business within three years by closing Davis-Besse in 2020, and the Perry and Beaver Valley plant near Pittsburgh in 2021.

Shortly after the announcement, FirstEnergy Solutions Corp, which was the nuclear division of First Energy, filed for bankruptcy protection. It now operates under the name Energy Harbor.

The company set about lobbying the state legislature for the nuclear subsidies it had failed to obtain. That strategy, according to the federal prosecutors, included funneling millions of dollars to an organization, Generation Now, controlled by Householder.

Householder used some of that money to position himself to become the next speaker. After Rosenberger resigned in April amid a scandal of his own, Rep. Ryan Smith, another bailout opponent, assumed the speaker's job. But Householder courted a number of Democrats and built a coalition to win the power struggle.

### Approving the bailout

The push for House Bill 6 took off in earnest. After the bill was introduced, First Energy stepped up payments to Generation Now, which paid for mailings and media advertisements to pressure lawmakers into supporting the bill.

The utility financed Ohio Clean Energy Jobs Alliance, which included mayors, school officials, labor unions an economic development officials, to promote the idea of saving the nuclear plants and the jobs they provided.

What was missing was any concrete explanation from FirstEnergy of why it needed the bailout. The company never provided specifics about the plant's profitability, but it didn't matter.

In July 2019, only six months into Householder's term as speaker, HB 6 passed 51-38 and cleared the Ohio Senate. Gov. Mike DeWine did not hesitate to sign it into law.

### Tapping customers for cash

The bill was a huge boost to FirstEnergy as it required every residential electricity customer in Ohio to pay a monthly surcharge of 85 cents and for large industrial plants to pay an additional $2,400 a month, starting in 2021 and extending through 2027.

It also called for an additional monthly fee to subsidize coal plants in Ohio and Indiana, while eliminating state-imposed mandates on energy efficiency and renewable energy. Trish Demeter, chief of staff at the Ohio Environmental Council Fund, believes merging the three – the nuclear bailout, the coal subsidies and the rolled-back mandates – helped secure the bill's passage.

For example, it gave the ideologically minded legislator opposed to mandates a reason to vote for it, Demeter said.

With the three issues aligned and the strong-armed tactics employed by Householder and his crew, "it's not surprising that it got through with all of this money and interest fueling that pressure to get it done," Demeter said.

**A failed referendum**

It was a crushing blow to consumer watchdogs and to renewable energy advocates who quickly mounted a drive to overturn the law by referendum only to be met by fierce opposition.

The same forces that conspired to get the bill enacted, moved against the opposition.

TV and radio ads alleged that signing the petition to overturn HB 6 "equated with ceding control of Ohio energy to China," according to federal prosecutors. Workers attempting to get signatures were accosted while doing their job.

The petition drive failed to gain the required number of signatures to be placed on the ballot.

**A boost for investors**

As a final kick in the teeth to the opposition, critics allege proceeds from the increased rates didn't go to bailout the plants but to bolster the share price of the investors who acquired the nuclear plants.

FirstEnergy Solutions, which owned the two Northern Ohio nuclear plants, emerged from bankruptcy in February as Energy Harbor Corp.

Then in May, the board of Energy Harbor agreed to buy back $300 million in stock – on top of the $500 million it had previously approved, thus driving up its share price and allowing investors to cash out their shares – immediately fueling suspicions that enriching shareholders had been the reason for HB 6 all along.

Ned Hill, the Ohio State professor who opposed the bailout, wasn't surprised.

"This was an act of socialism, where you socialize the risk and privatize the benefits," Hill said. "So it's no big surprise they're now going to make sure their investors get a return from their investment in the political process. They won, so they get their cash."

129.     The price of FirstEnergy stock plummeted on this news, falling to a low of just

56

$22.85 per share on July 22, 2020, 45% below the stock's closing price on July 20, 2020 of $41.26 per share, on abnormally high trading volume.

## DAMGES TO FIRSTENERGY

130.     As a result of the Individual Defendants' wrongful conduct, FirstEnergy engaged in the wrongful bribery scheme and in connection therewith disseminated false and misleading statements and omitted material information to make such statements not false and misleading when made. The improper statements have devastated FirstEnergy's credibility. FirstEnergy has been, and will continue to be, severely damaged and injured by the Individual Defendants' misconduct.

131.     As described herein, the Company has incurred and will continue to incur costs associated with defending itself in the federal subpoenas it received in the Criminal Action.

132.     The Company has incurred and will continue to incur costs associated with an internal investigation at the Company. Defendant Jones when responding to the media over the Criminal Action stated that the Company plans to do "an internal review of everything involved in the affidavit, which obviously is going to be necessary for us to respond to the questions in the subpoena."

133.     Moreover, the Individual Defendants' false and misleading statements as alleged above, have subjected FirstEnergy to the Securities Class Action.

134.     As a direct and proximate result of the Individual Defendants' actions as alleged above, FirstEnergy's market capitalization has been substantially damaged, losing millions of dollars in value as a result of the conduct described herein, and resulting in the Company having to raise money at a lower share price than it would have without the Individual Defendants' false and misleading statements.

135.     Lastly, these actions have irreparably damaged FirstEnergy's corporate image and

goodwill. For at least the foreseeable future, FirstEnergy will suffer from what is known as the "liar's discount," a term applied to the stocks of companies that have been implicated in illegal behavior and have misled the investing public, such that FirstEnergy's ability to raise equity capital or debt on favorable terms in the future is now impaired.

## DERIVATIVE ALLEGATIONS

136.    Plaintiffs incorporate by reference and reallege each and every allegation set forth above, as though fully set forth herein.

137.    Plaintiffs bring this action derivatively in the right and for the benefit of the Company to redress the Individual Defendants' breaches of fiduciary duties and other violations of law.

138.    Plaintiffs are owners of FirstEnergy common stock and were owners of FirstEnergy common stock at all times relevant hereto.

139.    Plaintiffs will adequately and fairly represent the Company's and its stockholders' interests in enforcing and prosecuting its rights.

140.    As a result of the facts set forth herein, Plaintiffs have not made any demand on the FirstEnergy Board to institute this action against the Individual Defendants. Such a demand would be a futile and useless act because the Board is incapable of making an independent and disinterested decision to institute and vigorously prosecute this action.

141.    At the time this action was commenced, the Board consisted of the Director Defendants: Anderson, Demetriou, Johnson, Jones, Misheff, Mitchell, O'Neil, Pappas, Pianalto, Reyes, and Turner. The Director Defendants, *i.e.*, the entire Board, are incapable of making an independent and disinterested decision to institute and vigorously prosecute this action for the following reasons.

A. **DEMAND IS EXCUSED BECAUSE THE DIRECTOR DEFENDANTS EACH FACE A SUBSTANTIAL LIKELIHOOD OF LIABLITY**

142. Defendants Anderson, Demetriou, Johnson, Jones, Misheff, Mitchell, O'Neil, Pappas, Pianalto, Reyes, and Turner all face a substantial likelihood of liability for their individual misconduct. The challenged misconduct at the heart of this case involves the Director Defendants' knowingly and/or consciously allowing the massive bribery scheme that has ensnared the Company. The Director Defendants in their capacity as corporate directors affirmatively adopted, implemented, and/or condoned a business strategy that resulted in FirstEnergy's stunningly massive bribery scheme. The Board cannot plausibly claim ignorance concerning the Company's violations of law that has resulted in the Company receiving subpoenas to a massive criminal investigation that is considered to be the biggest bribery scandal to hit the State of Ohio.

143. Additionally, Defendants Anderson, Demetriou, Johnson, Jones, Misheff, Mitchell, O'Neil, Pappas, Pianalto, Reyes and Turner were directors either throughout, or part of, the time of the false and misleading statements, and as such had a fiduciary duty to ensure that the Company's SEC filings, press releases, and other public statements and presentations on behalf of the Company concerning its business, operations, prospects, internal controls, and financial statements were accurate.

144. Defendants Anderson, Demetriou, Johnson, Jones, Misheff, Mitchell, O'Neil, Pappas, Pianalto, Reyes and Turner as directors, owed a duty to, in good faith and with due diligence, exercise reasonable inquiry, oversight, and supervision to ensure that the Company's internal controls were sufficiently robust and effective (and were being implemented effectively), and to ensure that the Board's duties were being discharged in good faith and with the required

diligence and due care. Instead, they knowingly and consciously reviewed, authorized, and/or caused the publication of the materially false and misleading statements discussed above that caused the Company's stock to trade at artificially inflated prices.

145. In addition, Defendants Anderson, Demetriou, Johnson, Jones, Misheff, Mitchell, O'Neil, Pappas, Pianalto, and Reyes caused the Company to issue the false and misleading 2018 Proxy and Defendants Anderson, Demetriou, Johnson, Jones, Misheff, Mitchell, O'Neil, Pappas, Pianalto, Reyes and Turner caused the Company to issue the false and misleading 2019 and 2020 Proxies.

146. Defendants Anderson, Demetriou, Johnson, Jones, Misheff, Mitchell, O'Neil, Pappas, Pianalto, Reyes and Turner face a substantial likelihood of liability for their conscious and knowing making or authorization of false and misleading statements, failure to timely correct such statements, failure to take necessary and appropriate steps to ensure that the Company's internal controls were sufficiently robust and effective (and were being implemented effectively), failure to take necessary and appropriate steps to ensure that the Board's duties were being discharged in good faith and with the required diligence constitute breaches of the fiduciary duties of loyalty and good faith. If Defendants Anderson, Demetriou, Johnson, Jones, Misheff, Mitchell, O'Neil, Pappas, Pianalto, Reyes and Turner were to bring a suit on behalf of FirstEnergy to recover damages sustained as a result of this misconduct, they would expose themselves to significant liability. This is something they will not do.

147. For these reasons, demand is futile as to Defendants Anderson, Demetriou, Johnson, Jones, Misheff, Mitchell, O'Neil, Pappas, Pianalto, Reyes and Turner.

**B.     DEMAND IS FUTILE AS TO DEFENDANT JONES**

148. Demand on Defendant Jones is futile for several reasons. Defendant Jones is the Company's President and CEO and member of the Board since 2015. Jones's principal

professional occupation is his employment with the Company as its President and CEO, pursuant to which he has received and continues to receive substantial monetary compensation and other benefits. For 2019, 2018, and 2017 Jones earned $ 9,073,076, $9,858,109, and $8,751,603, respectively, in compensation. These amounts are material to him and therefore he cannot independently consider a demand against Defendants O'Neil, Pappas, Pianalto, and Turner who, as Compensation Committee members, determine his compensation.

149.    However, more significantly, demand on Defendant Jones is futile because he is at the heart of the bribery scheme, complained of herein. For example, Defendant Jones is alleged to have had 84 personal phone contacts with Householder during the Relevant Period at the exact time that FirstEnergy was funneling tens of millions of dollars to the Householder Enterprise and it was taking part in overt acts in furtherance of the illicit activities detailed herein.

150.    Additionally, Jones is incapable of considering a demand to commence and vigorously prosecute this action because he faces additional substantial likelihood of liability as he is a named defendant in the Securities Class Action.

**C.    DEMAND IS FUTILE AS TO DEFENDANTS ANDERSON, DEMETRIOU, JOHNSON, JONES, MISHEFF, MITCHELL, O'NEIL, PAPPAS, AND REYES BECAUSE THEY IGNORED SHAREHOLDER DEMANDS ON POLITICAL AND LOBBYING TRANSPARENCY**

151.    Demand is futile as to Defendants Anderson, Demetriou, Johnson, Jones, Misheff, Mitchell, O'Neil, Pappas and Reyes because they repeatedly ignored, and in fact opposed, shareholder proposals to have full transparency regarding the Company's lobbying activities, which are at the heart of the bribery scheme. In the Company's proxy statement filed on March 31, 2017, (the "2017 Proxy"), the following shareholder proposal was submitted for consideration:

Item 9 — Shareholder Proposal Requesting an Annual Report on Lobbying Policies and Payments

The Nathan Cummings Foundation, 475 Tenth Avenue, 14th Floor, New York, New York 10018, plans to introduce the following resolution at the Annual Meeting. We have been notified that The Nathan Cummings Foundation is the beneficial owner of no less than 824 shares of your Company's common stock.

**Whereas**, we believe full disclosure of our company's direct and indirect lobbying activities and expenditures is required to assess whether FirstEnergy's lobbying is consistent with its expressed goals and in the best interests of shareholders.
**Resolved**, the shareholders of FirstEnergy request the preparation of a report, updated annually, disclosing:

1. Company policy and procedures governing lobbying, both direct and indirect, and grassroots lobbying communications.

2. Payments by FirstEnergy used for (a) direct or indirect lobbying or (b) grassroots lobbying communications, in each case including the amount of the payment and the recipient.

3. FirstEnergy's membership in and payments to any tax-exempt organization that writes and endorses model legislation.

4. A description of the decision making process and oversight by management and the Board for making payments described in section 2 and 3 above.

For purposes of this proposal, a "grassroots lobbying communication" is a communication directed to the general public that (a) refers to specific legislation or regulation, (b) reflects a view on the legislation or regulation and (c) encourages the recipient of the communication to take action with respect to the legislation or regulation. "Indirect lobbying" is lobbying engaged in by a trade association or other organization of which FirstEnergy is a member.

Both "direct and indirect lobbying" and "grassroots lobbying communications" include efforts at the local, state and federal levels.

The report shall be presented to the Audit Committee or other relevant oversight committee and posted on FirstEnergy's website.

152.     The Board recommended that shareholders vote "against" this proposal, which shareholders did. Similar shareholders proposals regarding transparency on the Company's political lobbying and/or expenditures were also proposed in 2016 and 2015 but again both were

aggressively opposed by the Board and met the same fate.

153. Defendants Anderson, Demetriou, Johnson, Jones, Misheff, Mitchell, O'Neil, Pappas and Reyes knowingly allowing the Company to engage in the bribery scheme and/or conscious disregard to failure to institute adequate operational controls over the Company's political activities over an extended period of time after numerous shareholder proposals wanting transparency regarding the Company's political activities is evidence that Defendants Anderson, Demetriou, Johnson, Jones, Misheff, Mitchell, O'Neil, Pappas and Reyes will not take any action against themselves or each other as they each face a substantial likelihood of liability. The Criminal Action is a direct consequence of their failure to put into place actions that would have stopped the bribery scheme from occurring, and actions that Defendants Anderson, Demetriou, Johnson, Jones, Misheff, Mitchell, O'Neil, Pappas and Reyes told FirstEnergy shareholders to vote against and were unnecessary at the Company, and therefore they are liable for breaching their fiduciary duties.

**D. DEMAND IS FUTILE AS TO DEFENDANTS O'NEIL, ANDERSON, MISHEFF, PIANALTO, AND TURNER BECAUSE AS MEMBERS OF THE AUDIT COMMITTEE THEY FACE A SUBSTANTIAL LIKELIHOOD OF LIABILITY**

154. Defendants O'Neil, Anderson, Misheff, Pianalto, and Turner as members of the Audit Committee during the Relevant Period, participated in and knowingly approved the filing of false financial statements, and allowed the Individual Defendants to repeatedly make false and misleading statements to the investing public. More specifically, as members of the Audit Committee, Defendants O'Neil, Anderson, Misheff, Pianalto, and Turner were obligated to review the Company's annual and quarterly reports to ensure their accuracy. Instead, Defendants O'Neil, Anderson, Misheff, Pianalto, and Turner, as members of the Audit Committee, failed to ensure the integrity of the Company's financial statements and financial reporting process, the

Company's systems of internal accounting and financial controls, and other financial information provided by the Company, as required by the Audit Committee Charter. For this reason, demand is futile as to Defendants O'Neil, Anderson, Misheff, Pianalto, and Turner.

**E.    DEMAND IS FUTILE AS TO DEFENDANTS ANDERSON, JOHNSON, MISHEFF, MITCHELL, AND REYES BECAUSE AS MEMBERS OF THE CORPORATE GOVERNANCE AND CORPORATE RESPONSIBILITY COMMITTEE THEY FACE A SUBSTANTIAL LIKELIHOOD OF LIABILITY**

155.    Defendants Anderson, Johnson, Misheff, Mitchell, and Reyes as members of the Corporate Governance and Corporate Responsibility Committee during the Relevant Period, allowed the Individual Defendants to engage in the bribery scheme. Per the Company's proxy statements, as members of the Corporate Governance and Corporate Responsibility Committee during the Relevant Period, Defendant Anderson, Johnson, Misheff, Mitchell, and Reyes's oversight responsibilities were as follows:

> Public Policy and Engagement
>
> We have decision-making and oversight processes in place for political contributions and expenditures. Our Corporate Political Activity Policy available on our website describes the criteria for certain political contributions and ballot initiative expenditures and the process for approving such contributions and expenditures. Also, your Board's Corporate Governance and Corporate Responsibility Committee periodically reviews this policy and related practices as well as dues and/or contributions to industry groups and trade associations.

156.    Defendants Anderson, Johnson, Misheff, Mitchell, and Reyes were obligated to oversee the Company's political contributions and expenditures and to ensure that in connection therewith the Company was in compliance with the law. Instead, Defendants Anderson, Johnson, Misheff, Mitchell, and Reyes, as members of the Corporate Governance and Corporate Responsibility Committee, failed to stop the tens of millions of dollars that were transferred from FirstEnergy bank to Householder Enterprises, in order to secure one of the Company's top legislative priorities. For this reason, demand is futile as to Defendants Anderson, Johnson,

Misheff, Mitchell, and Reyes.

## CLAIMS FOR RELIEF

### COUNT I
#### VIOLATIONS OF SECTION 14(a) OF THE EXCHANGE ACT
#### AGAINST THE DIRECTOR DEFENDANTS

157.    Plaintiffs incorporate by reference and re-allege each and every allegation set forth above, as though fully set forth herein.

158.    The Section 14(a) Exchange Act claims alleged herein are based solely on negligence. They are not based on any allegation of reckless or knowing conduct by or on behalf of the Director Defendants. The Section 14(a) claims alleged herein do not allege and do not sound in fraud. Plaintiffs specifically disclaim any allegations of, reliance upon any allegation of, or reference to any allegation of fraud, scienter, or recklessness with regard to those non-fraud claims.

159.    Section 14(a) of the Exchange Act provides that "[i]t shall be unlawful for any person, by use of the mails or instrumentality of interstate commerce or of any facility of a national securities exchange or otherwise, in contravention of such rules and regulations at the [SEC] may prescribe as necessary or appropriate in the public interest or for the protection of investors, to solicit or to permit the use of his name to solicit any proxy or consent or authorization in respect of any security (other than an exempted security) registered pursuant to section 12 of this title [15 U.S.C. § 78l]."

160.    Rule 14a-9, promulgated pursuant to § 14(a) of the Exchange Act, provides that no proxy statements shall contain "any statement which, at the time and in the light of the circumstances under which it is made, is false or misleading with respect to any material fact, or which omits to state any material fact necessary in order to make the statements therein not false or misleading." 17 C.F.R. §240.14a-9.

161. Under the direction and watch of the Director Defendants, the Company's 2018, 2019 and 2020 Proxy Statements (the "Proxy Statements" or "Proxies") failed to disclose, *inter alia,* the illegal bribery scheme described herein, and that the Company failed to maintain adequate controls and oversight to prevent such wrongful conduct, thus rendering the Proxy Statements false and misleading.

162. In the exercise of reasonable care, the Director Defendants should have known that by misrepresenting or failing to disclose the forgoing material facts, the statements contained in the Proxy Statements were materially false and misleading. The misrepresentations and omissions were material to the Company's shareholders in voting on matters set forth for shareholder determination in the Proxy Statements, including the election of directors, advisory approval of the executive compensation, and whether or not to approve the Plan, as described herein.

163. The Company was damaged as a result of the Director Defendants' material misrepresentations and omissions in the Proxy Statements.

164. Plaintiffs on behalf of FirstEnergy have no adequate remedy at law.

## COUNT II
### BREACH OF FIDUCIARY DUTY
### AGAINST ALL THE INDIVIDUAL DEFENDANTS

165. Plaintiffs incorporate by reference and re-allege each and every allegation set forth above, as though fully set forth herein.

166. Each Individual Defendant owed to the Company the duty to exercise candor, good faith, due care, and loyalty in the management and administration of FirstEnergy's business and affairs.

167. Each of the Individual Defendants violated and breached his or her fiduciary duties of candor, good faith, loyalty, due care, reasonable inquiry, oversight and supervision.

168.    By virtue of their positions as directors and/or officers of FirstEnergy and their exercise of control over the business and corporate affairs of the Company, the Individual Defendants have, and at all relevant times had, the power to control and influence and did control and influence and cause the Company to engage in the practices complained of herein. Each Defendant was required to: (a) use his or her ability to control and manage FirstEnergy in a fair, just, and equitable manner; and (b) act in furtherance of the best interests of FirstEnergy and its shareholders and not his or her own. Defendants also have the duty to oversee its CEO and ensure that he is not breaching his fiduciary duties to the Company.

169.    Additionally, the Individual Defendants have a duty to implement a reasonable system of controls to ensure that FirstEnergy is operated in conformity with applicable laws. Once that system is in place, the Directors have a duty to respond in good faith to reports or indications that FirstEnergy or its employees are engaging in unlawful or other improper behavior. The Individual Defendants have acted in violation of FirstEnergy's internal policies, including, *inter alia*, its policies regarding corporate governance, business conduct and ethics in causing the Company to engage in the bribery scheme alleged herein and in connection therewith issue false and misleading statements.

170.    The Individual Defendants breached their fiduciary duties by acting to subvert and/or failing to take any action to investigate and/or stop the improper and illegal conduct at FirstEnergy.

171.    Based on the foregoing conduct, the Individual Defendants were not acting in good faith toward the Company, but instead were acting recklessly and/or with intent to harm the Company and breached their fiduciary duties.

172.    As a direct and proximate result of the Individual Defendants' conscious failure to

perform their fiduciary obligations, FirstEnergy has been and will continue to be damaged.

173.     As a result of the misconduct alleged herein, the Individual Defendants are liable to the Company.

174.     Plaintiffs, on behalf of First Energy, have no adequate remedy at law.

## COUNT III
### BREACH OF FIDUCIARY DUTY IN CONNECTION WITH MISAPPROPRIATION OF INFORMATION AND INSIDER STOCK SALES AGAINST DEFENDANTS JONES AND PEARSON

175.     Plaintiffs incorporate by reference and reallege each of the foregoing allegations as though fully set forth in this paragraph.

176.     At the time of each of the stock sales set forth herein, Defendants Jones and Pearson knew, but did not disclose publicly, that the Company was engaging in a bribery scheme, had inadequate internal controls regarding its financial reporting and compliance and had made false and misleading statements in connection therewith. Defendants Jones and Pearson made each of the stock sales described herein on the basis of and because of their knowledge of the material non-public information described herein.

177.     At the time of their stock sales, Defendants Jones and Pearson knew that the bribery scheme, the insufficient internal controls and the false and misleading statements in connection therewith would likely result in the artificial inflation of FirstEnergy's stock price. Defendants Jones and Pearson's sale of FirstEnergy common stock based on their knowledge of this material non-public information was a breach of their fiduciary duties of loyalty and good faith.

## COUNT IV
### UNJUST ENRICHMENT AGAINST DEFENDANTS JONES, STRAH, REFFNER, AND PEARSON

178.     Plaintiffs incorporate by reference all preceding and subsequent paragraphs as if

fully set forth herein.

179.     By their wrongful acts and omissions, Defendants Jones, Strah, Reffner, and Pearson were unjustly enriched at the expense and to the detriment of FirstEnergy.

180.     All the payments and benefits provided to Defendants Jones, Strah, Reffner, and Pearson were at the expense of FirstEnergy. The Company received no benefit from these payments.

181.     Plaintiffs, on behalf of FirstEnergy, seek restitution from Defendants Jones, Strah, Reffner, and Pearson and seeks an order of this Court disgorging all profits, benefits, and other compensation obtained by Defendants Jones, Strah, Reffner, and Pearson from their wrongful conduct and fiduciary breaches.

182.     Additionally, Defendant Jones and Pearson were unjustly enriched by their receipt of proceeds from their illegal sales of FirstEnergy common stock, as alleged herein, and it would be unconscionable to allow them to retain the benefits of their illegal conduct.

183.     To remedy Defendants Jones and Pearson's unjust enrichment, the Court should order them to disgorge to the Company all proceeds derived from their illegal sales of FirstEnergy common stock.

### **PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs pray for judgment against all defendants as follows:

A.     Declaring that Plaintiffs may maintain this derivative action on behalf of FirstEnergy, and that Plaintiffs are proper and adequate representatives of the Company;

B.     Determining the Individual Defendants have breached their fiduciary duties to FirstEnergy and other violations of law;

C.     Declaring that the Individual Defendants are obligated to contribute to,

indemnify and hold FirstEnergy harmless from any fines, penalties, judgment, settlement or award pursuant to any of the class actions pending or to be filed against FirstEnergy or its employees or agents arising out of the breaches of duty and wrongdoing alleged herein;

D.      Awarding FirstEnergy the damages it sustained due to the violations alleged herein from each of the Individual Defendants jointly and severally, together with interest thereon;

E.      Awarding the amount of damages sustained by the Company as a result of the Individual Defendants' breaches of fiduciary duties;

F.      Ordering defendants Jones and Pearson to disgorge to the Company all proceeds derived from their sales of FirstEnergy common stock alleged herein, and ordering disgorgement of all profits, benefits, and other compensation obtained by Jones, Strah, Reffner, and Pearson;

G.      Granting appropriate equitable relief to remedy Individual Defendants' breaches of fiduciary duties and other violations of law, including, but not limited to the institution of appropriate corporate governance measures;

H.      Awarding to Plaintiffs the costs and disbursements of the action, including reasonable attorneys' fees, accountants' and experts' fees and costs and expenses; and

I.      Granting such other and further relief as the Court deems just and proper.

## DEMAND FOR JURY TRIAL

Plaintiffs hereby demands a trial by jury.

Dated:  September 1, 2020                           Respectfully submitted,

*/s/ Michael J. Boyle, Jr.*
**MEYER WILSON CO., LPA**
David P. Meyer (0065205)
Email: dmeyer@meyerwilson.com
Matthew R. Wilson (0072925)
Email: mwilson@meyerwilson.com
Michael J. Boyle, Jr. (0091162)
Email: mboyle@meyerwilson.com
1320 Dublin Road, Suite 100
Columbus, OH  43215
(614) 224-6000; Fax: (614) 224-6066

**HYNES & HERNANDEZ, LLC**
Michael J. Hynes (*pro hac vice* to be filed)
Ligaya T. Hernandez (*pro hac vice* to be filed)
101 Lindenwood Drive, Suite 225
Malvern, PA 19355
Telephone: (484) 875-3116
Facsimile: (914) 752-3041

**KASKELA LAW, LLC**
D. Seamus Kaskela (*pro hac vice* to be filed)
18 Campus Boulevard, Suite 100
Newtown Square, PA 19073
Telephone: (484) 258-1585

*Counsel for Plaintiffs*